## DON JOHNSON MOTORS, INC., Plaintiff,

### v.

## UNITED STATES of America, Defendant.

### Civil Action No. B–06–047.

United States District Court,
S.D. Texas,
Brownsville Division.

Dec. 21, 2007.

---

Robert Bryan Perry, Attorney at Law, Dallas, TX, for Plaintiff.

Thomas M. Herrin, Dallas, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

ANDREW S. HANEN, District Judge.

### I. BACKGROUND

1. Don Johnson Motors, Inc. ("Plaintiff") is a car dealership operating in the Brownsville, Texas area. (Testimony of Don Johnson, Sr. ("Johnson"), Day 1).[1] The corporation formed in 1974. (*Id.*)

2. Plaintiff added Jeep vehicles to its dealership, which resulted in an increase in sales volume and required Plaintiff to hire more employees. (Johnson, Day 1).

3. Sometime prior to 1999, because of the increase in employees, the Internal Revenue Service required Plaintiff to begin filing its taxes by Electronic Funds Transfer ("EFT"). (Johnson, Day 1). From that date forward, Plaintiff had to file its Form 940 annual federal unemployment taxes ("Form 940 taxes") and Form 941 quarterly employment taxes ("Form 941 taxes") electronically through the Electronic Federal Tax Payment System ("EFTPS"). (*See* A. Carlos Barrera ("Barrera"), Day 1).

4. In prior years, Plaintiff completed its tax returns and filings by hand. (Johnson, Day 1). Johnson testified that he had signed all the tax returns and made sure the payments were deposited. (*Id.*) Johnson testified that he felt like he "lost control when they took [Plaintiff's tax obligations] out of his hands." (*Id.*)

### A. *The IRS Assessed Penalties Against Plaintiff for Failure to Timely File Returns and Pay its Taxes for Periods from 1999 to 2002*

5. From 1999 through 2002, Plaintiff delegated payroll tax functions to an in-house accountant, Michael Ezequiel ("Ezequiel"). Ezequiel performed his role under the supervision of Plaintiff's office manager. (Pl.Ex. 6); (*see* Johnson, Day 1).

6. Plaintiff's office manager was responsible for oversight of the employment taxes and for signing Plaintiff's employment tax returns. (Pl.Ex. 6).

7. Plaintiff hired Ezequiel to handle, among other responsibilities, the actual

---

**1.** The trial testimony is referred to by the day of trial covered (i.e., Day 1, Day 2 or Day 3) as a formal transcript has not been requested by either party. When referring to trial testimony, the Court will use the form: (Witness Name, Day of Trial) (e.g., Johnson, Day 1). This Court's quotation of various witnesses is based on this Court's recollection of trial. Ultimately, the Court will defer to the formal statement of facts if the preparation of one is ever requested. Nevertheless, the Court is confident in the accuracy of the substance of the quotations.

electronic filing of its employment taxes. (Johnson, Day 1). Ezequiel prepared Plaintiff's employment tax returns and was also in charge of monitoring the payroll accounts and the information included in the Forms 940 and 941. (*See* Pl.Ex. 6). Johnson testified that Ezequiel was given "quite a bit of responsibility." (*Id.*)

8. At some point in 1999, for reasons not explained, Ezequiel stopped paying portions of Plaintiff's payroll taxes to the IRS. (*See* Johnson, Day 1); (Internal Revenue Service Revenue Officer Ricardo Sobrevilla ("Sobrevilla"), Day 2); (Pl.Ex. 3). As a result, Plaintiff made incomplete deposits to the IRS from 1999–2002. (Sobrevilla, Day 2); (Pl.Ex.3). Ezequiel also failed to make payments to Plaintiff's 401K plan. (Johnson, Day 1).

9. Plaintiff's incomplete deposits apparently masked the fact that Plaintiff was not fully complying with its tax obligations. (Sobrevilla, Day 2).

10. The executives of Plaintiff were unaware of any problems with its payroll accounts for the years 1999 through 2002 until Johnson began an internal review of Plaintiff's financial reports in December of 2002. (Pl.Ex. 6). In December of 2002, Johnson began his yearly analysis of Plaintiff's November financial statement to determine what Plaintiff might be able to "write off." (Johnson, Day 1). Johnson noticed that the November financial statement reflected a "lot more cash than [he] usually had." (*Id.*)

11. Plaintiff's cash management savings account had gone from $200,000 to nearly $800,000. (Johnson, Day 1). This excess cash worried Johnson because Plaintiff "was not making that much money" and Plaintiff's "inventories weren't going down." (*Id.*)

12. Also approximately around this time, Plaintiff was notified that it had not paid its employees' portion of the 401K participation in several months. (Johnson, Day 1).

13. Johnson initially believed the imbalances were the result of a change in computer software Plaintiff underwent in August of 2002. (*See* Johnson, Day 1); (Pl. Ex. 6).

14. Nevertheless, because of the extent of the irregularities, Johnson called his accountant, A. Carlos Barrera ("Barrera"), a partner at Long & Chilton, L.L.P., to investigate the situation. (Johnson, Day 1); (*see* Pl.Ex. 6).

15. Barrera and another Long & Chilton employee, Sandra Hargis ("Hargis"), initially thought an employee might be stealing money from Plaintiff and began checking Plaintiff's bank accounts. (Johnson, Day 1).

16. During the pendency of this action and throughout trial, Plaintiff has never alleged or presented any evidence demonstrating that Ezequiel or any other employee embezzled funds from Plaintiff.

17. In March 2003, Plaintiff received a notice from the IRS stating that Plaintiff had not sent in a Form 941 return for a quarter in 2002 and had not paid its payroll tax for that quarter. (Johnson, Day 1); (*see* Pl.Ex. 3).

18. Barrera and Hargis then recreated the Form 941 returns for each quarter in 2002. (Johnson, Day 1). Through this process, Barrera and Hargis discovered that, for some time, Ezequiel had not been paying portions of the payroll taxes and had been failing to make payments to Plaintiff's 401K plan for its employees. (Johnson, Day 1).

19. Barrera then consulted the IRS Taxpayer Hotline regarding the situation. (Barrera, Day 1). These consultations revealed that Plaintiff's failure to file Form 941 employment tax returns and pay Plaintiff's employment taxes extended be-

yond 2002 to periods in 1999, 2000 and 2001. (*Id.*)

20. Plaintiff filed late returns for tax periods in 1999–2002 in January, March and July of 2003. (*See* Def. Ex. 1 at pp. 10, 26, 35, 47, 60, 71, 82, 91, 101, 111, 119, 128, 135, 141). Plaintiff also paid at least some of the outstanding tax liabilities for those tax periods. (*Id.*)

21. The IRS assessed penalties against Plaintiff for its failure to file returns and timely pay taxes for periods in 1999 through 2002. (*See* Def. Ex. 1 at pp. 11, 28, 38, 52, 64, 75, 86, 94, 104, 112, 119, 128, 135, 141). Plaintiff received penalty notices for these tax periods beginning in 2003. (*See, e.g.,* Def. Ex. 1 at pp. 15, 32); (*see also* Pl. Proposed Findings of Fact and Conclusions of Law [hereinafter Pl. Findings] at p. 19).[2] Johnson also testified that Plaintiff received penalty notices. (Johnson, Day 2).

22. Plaintiff requested an abatement of all penalties assessed for periods in 1999–2002 for reasonable cause. (*See* Barrera, Day 1); (Pl.Ex.6). The IRS denied this request. (Pl.Ex. 32). The denial stated in part:

> Your request to abate … does not conform to reasonable cause.… A prudent businessman would exercise caution in the training of specific responsibilities of each new employee. You mentioned the failure by both the in-house accountant and the supervising manager to perform these responsibilities and the concealment of those failures for those years is what caused the delinquency.
>
> …
>
> [O]verall, reasonable cause requirements state, "Relying on another person to perform a required act is generally not

sufficient for establishing reasonable cause". [sic]

…

> This is your written notification that I have determined that your request for reasonable cause abatement was not met and I am denying abatement of all the penalties. (*Id.*)

23. Plaintiff appealed this denial of abatement. (Pl.Ex. 51). Plaintiff's appeal was also denied. (*Id.*)

24. Plaintiff has not paid the penalties and some accrued interest owed for the periods in 1999–2002. (*See* Johnson, Day 2); (Pl.Ex.78).

**B. *The IRS Also Assessed Penalties Against Plaintiff for Failure to Timely Pay and Deposit Its Taxes for Periods in 2003 and 2004***

25. Since Plaintiff was required to use EFTPS to file its employment taxes, Plaintiff utilized the Automated Clearing House ("ACH") system to transmit payment of payroll taxes to the IRS through the EFTPS–Through a Financial Institution System during a period which included 2003 and 2004. (*See* Hargis, Day 2); Dept. of Treasury, Financial Institution Handbook for EFTPS, Internet Version [hereinafter Handbook for EFTPS] 5 (2002), *available at,* http://www.fms.treas.gov/eftps/eftpshandbook.pdf.

26. A taxpayer using the EFTPS–Through a Financial Institution system authorizes a financial institution, such as the taxpayer's bank, to initiate an ACH credit transaction to pay the IRS. Handbook for EFTPS at p. 5. Plaintiff designated Texas State Bank (the "Bank") as its financial

---

**2.** Both Plaintiff and Defendant's Proposed Findings of Fact requested this Court to find that Plaintiff received penalty notices. This Court has independently determined that Plaintiff received penalty notices for those pe-

riods and will view the parties' request for findings of fact to be a further stipulation of fact on the issue of whether Plaintiff received penalty notices. *See* (Pl. Findings at p. 19); (Def. Findings at p. 12); Fed.R.Civ.P. 11.

institution for purposes of making payments of employment taxes to the IRS through EFTPS. (*See* Barrera, Day 1); HANDBOOK FOR EFTPS at p. 5.

27. The Bank provided Plaintiff with specific software to use when initiating EFTPS transactions. (Barrera, Day 1). Plaintiff's employee would use the software to instruct the Bank to transfer money from Plaintiff's account to an IRS account to cover Plaintiff's employment tax liability for a specified tax period. (*Id.*); (Hargis, Day 2).

28. In June 2003, the Bank implemented a new software program for Plaintiff to use when electronically filing its employment taxes. (Pl.Ex. 9). The Bank was supposed to send two people to train Plaintiff's employees on the new Bank software, however the Bank only sent one trainer. (Johnson, Day 1). It was later determined that this trainer had only worked for the Bank for two days. (*Id.*)

29. Two of Plaintiff's employees received this training from the Bank on the new Bank software. (Johnson, Day 1).

30. When utilizing the new Bank software, Plaintiff's employee would see a screen telling the employee to input the Plaintiff's tax identification information, Plaintiff's bank account number, and the amount the Plaintiff wanted to pay over to the IRS. (Hargis, Day 2).

31. The new software also required Plaintiff's employee to mark the tax period of the filing twice (e.g., First Quarter— 2004) *in two separate fields* before submitting its payment. (Barrera, Day 1); (Hargis, Day 1). The tax periods marked had to match or the new software would not make the deposit. (Barrera, Day 1).

32. Plaintiff's employees did not realize there were *two* fields that needed to be marked and that the two fields also needed to be identical. (Barrera, Day 1); (Hargis, Day 1). The trainer never told Plaintiff's employees about the need to mark the tax period in the second field during the Bank's training. (Barrera, Day 1).

33. Plaintiff's employees failed to mark and match these two fields when attempting to submit payments of Plaintiff's employment taxes. (*See* Barrera, Day 1); (Hargis, Day 1). Consequently, the Bank did not immediately make deposits on behalf of Plaintiff into the IRS accounts. (*See id.*) Several of Plaintiff's employment tax payments were therefore received late by the IRS. (*See, e.g.,* Def. Ex. 1 at pp. 152–153, 163, 172).

34. Since Plaintiff failed to timely deposit and pay its employment taxes for these periods in 2003–2004, the IRS assessed penalties against Plaintiff for these tax periods. (Def. Ex. 1 at pp. 153, 163, 172). The IRS sent notices of these assessments to Plaintiff. (*See* Def. Ex. 2 at p. 24); (Def. Ex. 1 at pp. 167, 176, 182); (*see also* Pl. Findings at p. 19).

35. IRS Revenue Officer Alice M. Rios ("Rios") conducted an investigation into the situation involving the Bank software and Plaintiff's late payments. (*See* Pl.Ex. 32).

36. The Bank sent Plaintiff a letter on February 6, 2004 admitting that its training of Plaintiff's employees on the new Bank software had been inadequate. (Pl. Ex. 9). The Bank had not made Plaintiff's employees aware that certain "manual updates" were required for each transaction. (*Id.*) These manual updates appear to include marking the tax period twice on the screen before electronically submitting tax payments. (*Id.*) The Bank admitted that its failure to adequately train Plaintiff's employees was the cause of Plaintiff's failure to make timely payments and deposits to the IRS through EFTPS in 2003–2004. (*Id.*)

37. Plaintiff's representatives testified that Barrera faxed the February 6, 2004 letter from the Bank to Rios on or around February 10, 2004. (Barrera, Day 1); (Hargis, Day 1); (*see* Johnson, Day 1).

38. It is unclear whether Rios ever received the fax of the Bank's February 6, 2004 letter admitting its fault in failing to properly train Plaintiff's employees. Rios stated in an October 14, 2004 letter that during her investigation, Plaintiff's employees told her the Bank did not agree that there were errors in its software or training and that the Bank would not submit written documentation to support the error. (Pl.Ex. 32). Rios made no mention of receiving the Bank's February 10, 2004 letter and, in fact, states that the Bank denied committing any error. (*See id.*)

39. Plaintiff claims that Rios never actually spoke to any of Plaintiff's employees as she stated in her October 14, 2004 letter. (Pl.Ex. 33). Johnson testified during trial, however, that he could not recall whether Rios spoke with Plaintiff's employees, but identified an employee that Rios may have spoken with. (Johnson, Day 1). It remains unclear whether Rios actually spoke to Plaintiff's employees and, if she did, who and how many employees she spoke with during her investigation.

40. Plaintiff requested an abatement of all penalties imposed for periods in 2003–2004 for reasonable cause. (*See* Pl. Exs. 9, 10). The IRS denied this request, at least in part on the findings of Rios's investigation. (*See* Pl.Ex. 32).

41. Plaintiff has not paid the penalties and some accrued interest owed for the periods in 2003–2004. (*See* Johnson, Day 2); (Pl.Ex. 78).

## C. *Liens Are Filed Against the Plaintiff*

42. In April 2005, the IRS sent Plaintiff notices that it was filing liens against

Plaintiff for outstanding tax liabilities. (*See, e.g.,* Def. Ex. 1 at pp. 164, 173).

43. The IRS filed two liens against Plaintiff in May 2005. (*See* Hargis, Day 1); (Johnson, Day 2).

44. The first lien, filed May 9, 2005, covered liabilities for periods in 2003–2004 (the "2003–2004 lien"). (Sobrevilla, Day 3); (*see* Trial Tr., Day 3). The liabilities on this lien totaled $101,279.92. (*See* Pl. Ex. 58).

45. The second lien, filed May 20, 2005, covered outstanding liabilities for periods in 1999–2002 (the "1999–2002 lien"). (Sobrevilla, Day 3); (*see* Trial Tr., Day 3). The liabilities on this lien totaled $277,078.40. (*See* Pl.Ex. 52).

## D. *Plaintiff Alleges It Fully Paid the Liabilities on the 2003–2004 Lien on May 10, 2005*

46. On May 10, 2005, IRS Revenue Officer Sobrevilla met with Plaintiff's representatives regarding taxes and penalties owed for periods in 2003–2004. (Barrera, Day 1); (Hargis, Day 1); (*see* Johnson, Day 1).

47. Plaintiff's representatives demonstrated to Sobrevilla how Plaintiff had attempted to pay all the liabilities owed for 2003–2004 on time. (*See* Hargis, Day 1); (*see* Barrera, Day 1); (Johnson, Day 1); (Sobrevilla, Day 2).

48. After a thorough analysis of Plaintiff's tax accounts, Sobrevilla determined that if the IRS reallocated Plaintiff's late tax payments for periods in 2003–2004 so that they would be properly filed, Plaintiff would only be left with an outstanding liability of $1,716.47 for periods in 2003–2004. (*See* Hargis, Day 1); (*see* Barrera, Day 1); (Johnson, Day 1); (Sobrevilla, Day 2).

49. Plaintiff's representatives and Sobrevilla agreed that Sobrevilla would real-

locate the tax payments and that Plaintiff would provide an additional payment of the $1,716.47 so that the liabilities for tax periods in 2003–2004 would be extinguished. (*See* Barrera, Day 1); (Sobrevilla, Day 2).

50. Don Johnson, Jr. then delivered a check to the meeting and Johnson gave the check to Sobrevilla at the May 10, 2005 meeting in the amount of $1,716.47 to cover the outstanding balance. (*See* Hargis, Day 1); (Johnson, Day 1); (Barrera, Day 1); (Don Johnson, Jr., Day 3).

### 1. *Sobrevilla Secured an Amended Return for the First Quarter of 2004*

51. During a period including May 2005, Plaintiff's outside accountants at Long & Chilton reviewed all of Plaintiff's tax accounts, including those for periods in 2003–2004. (*See* Johnson, Day 2).

52. The accountants would bring Johnson tax returns that required revisions. (Johnson, Day 2). Johnson signed and paid these amended returns. (*Id.*)

53. Among these revised returns was an amended Form 941 return for the first quarter of 2004. (Def. Ex. 14 at p. 6); (Johnson, Day 2). This amended return was filed on May 23, 2005. (Def. Ex. 14 at p. 6). Johnson signed the return as president of Plaintiff. (*Id.*); (Johnson, Day 2).

54. Sobrevilla was personally involved in securing this return for the IRS and received the return at some point between May 23, 2005 and May 27, 2005. (*See* Sobrevilla, Day 3).

55. The amended return created an additional liability of $5,734.82 on Plaintiff's first quarter 2004 Form 941 account. (Sobrevilla, Day 3); (Def. Ex. 1 at p. 182). This amount posted to Plaintiff's account on May 27, 2005. (*Id.*)

### 2. *Sobrevilla Inputs the Adjustments and Reallocations into the IRS System*

56. Sobrevilla could not input the reallocations and adjustments during the May 10, 2005 meeting because he could not access the IRS computer system from Plaintiff's office. (Barrera, Day 1); (*see* Sobrevilla, Day 2).

57. Following the meeting, each day until May 27, 2005, Sobrevilla worked on the adjustments and reallocations to Plaintiff's account that had been agreed to at the May 10, 2005 meeting (Sobrevilla, Day 2).

58. On May 27, 2005, Sobrevilla sent Plaintiff a letter with his analysis of Plaintiff's liabilities for periods including those covered by the 2003–2004 lien. (*See* Pl.Ex. 54). The letter stated, in part:

> As agreed, I have completed the analysis of your account and have made all the necessary adjustments that include transfers of erroneously applied credits, adjustments and abatements of penalties and interest. The purpose of this letter is to provide you [Plaintiff], as close as possible, a breakdown of the remaining liability. (Pl.Ex. 54).

59. The May 27, 2005 letter showed that Plaintiff: (1) had a $0 balance for its first quarter 2003 Form 941; (2) owed $3,805.73 for its second quarter 2003 Form 941; (3) owed $252.05 for its third quarter 2003 Form 941; (4) had a positive account balance (i.e., the IRS owed Plaintiff money) of $1,716.47 for its fourth quarter 2003 Form 941; and (5) had another positive account balance of $3,959.42 for its first quarter 2004 Form 941. (Pl.Ex. 54).

60. Totaling these liabilities and positive balances gave Plaintiff an overall positive balance for tax periods in 2003–2004 of $1,618.11 on May 27, 2005. (*See* Pl.Ex. 54).

61. Sobrevilla does not recall including the additional liability from the amended return for the first quarter of 2004 as a part of the analysis and adjustments documented in his May 27, 2005 letter to the Plaintiff, even though Sobrevilla personally secured this return prior to the time the letter was sent. (Sobrevilla, Day 3). Sobrevilla testified the additional assessment of $5,734.82 would create liabilities on the 2003–2004 lien not addressed in the May 27, 2005 letter. (*See id.*)

62. Sobrevilla could not release the lien through the IRS system until all the periods for the 2003–2004 lien registered as "status 12." (Sobrevilla, Day 2, Day 3). A "status 12" indicator means a tax account is zeroed out or fully paid. (*Id.* at Day 3).

63. Through an IRS clerical error some of the transfers and adjustments Sobrevilla and Plaintiff agreed upon on May 10, 2005 were never made. (Sobrevilla, Day 3). The adjustments Sobrevilla said had already been made in his May 27, 2005 letter still have not been completed. (*Id.*)

### 3. The IRS Conducted a Combined Annual Wage Reconciliation on Plaintiff's Tax Accounts in June 2005

64. Prior to June 13, 2005, the IRS conducted a combined annual wage reconciliation on Plaintiff's tax accounts, including Plaintiff's fourth quarter 2003 Form 941 account. (Sobrevilla, Day 3).

65. During a combined annual wage reconciliation, the IRS matches Social Security wages, W2 forms and W3 forms submitted to the Social Security Administration with the payroll tax returns submitted by the taxpayer to the IRS. (Sobrevilla, Day 3).

66. If the Social Security records and payroll tax returns do not match, the IRS sends out a notice advising the taxpayer that the figures do not match up. (Sobrevilla, Day 3). The IRS then proposes an adjustment to Plaintiff's tax accounts. (*Id.*)

67. If the taxpayer does not respond to the proposed IRS adjustment, the IRS makes the adjustment based on its prior reconciliation. (Sobrevilla, Day 3).

68. As a result of the combined annual wage reconciliation procedure stated above, the IRS assessed additional tax and interest of $5,735.62 and penalties of $1,849.54 against Plaintiff on June 13, 2005 for the fourth quarter of 2003 Form 941 account. (Def. Ex. 1 at pp. 175–76); (Sobrevilla, Day 3).

69. Statutory notice went out regarding this assessment on March 6, 2006. (Sobrevilla, Day 3); (*see* Def. Ex. 1 at pp. 175–76). It is unclear whether this notice informed Plaintiff of the discrepancy between the Social Security records and Plaintiff's payroll records or whether the notice was of the final adjustment to Plaintiff's account based on the reconciliation by the IRS.

### 4. Plaintiff Filed a Request for Certificate of Release of Lien

70. On June 24, 2005, Plaintiff filed a request for certificate of release of the 2003–2004 lien. (Pl.Ex. 58). The request was submitted to the District Director in Cincinnati, marked for the attention of the "Chief, Special Procedures Function." (*Id.*) The name and address of Plaintiff were provided as well as a copy of the Notice of Federal Tax Lien for the 2003–2004 lien. (*Id.*)

71. The request for certificate of release of lien listed as the grounds for release that: "[on] May 10, 2005, Mr. Don Johnson, Sr., President of the taxpayer, hand delivered a check to Ricardo Sobrevilla in the approximate amount of $1,716.47 in complete payment of *ALL* outstanding Form 940 and Form 941 taxes

owed by the taxpayer[ ] for the years and all quarters within 2003 and 2004." (Pl. Ex. 58) (emphasis in original).

72. Plaintiff did not include proof of its payment of $1,716.47 with its request for certificate of release of lien. (*See* Pl.Ex. 58).

### 5. *Plaintiff Files its CDP Appeal*

73. Plaintiff filed a request for a Collection Due Process ("CDP") hearing pursuant to 26 U.S.C. § 6320 and Tres. Reg. § 301.6320-1 on June 9, 2005 claiming that Plaintiff was not given proper notice prior to the filing of liens for the 1999–2002 and 2003–2004 periods and that the liabilities on the liens were invalid. (*See* Pl.Ex. 56).

74. Pursuant to IRS procedures, filing a CDP appeal had the internal effect of removing Sobrevilla's jurisdiction over Plaintiff's tax accounts. (Pl.Ex. 57)

75. On February 28, 2006, IRS Appeals Officer Christopher Darling ("Darling") issued his CDP determination, sustaining the filing of both the 1999–2002 lien and the 2003–2004 lien. (Pl.Ex. 75). He found that there were outstanding liabilities for periods covered by each lien and that the IRS gave Plaintiff proper statutory notice pursuant to 26 U.S.C. § 6321 prior to filing each lien. (*Id.*)

76. The IRS has not released either the 2003–2004 lien or the 1999–2002 lien. (Johnson, Day 1); (Hargis, Day 1).

### II. PROCEDURAL HISTORY OF THIS LITIGATION

77. Plaintiff filed a Complaint against Defendant United States of America ("Defendant") on March 21, 2006. (Docket No. 1).

78. The Complaint stated claims for:
(i) the refund of internal revenue taxes for periods in 1999–2002;

(ii) judicial review of the CDP determination on the 1999–2002 lien and 2003–2004 lien;

(iii) civil damages for failure to release the 1999–2002 lien and 2003–2004 lien pursuant to 26 U.S.C. § 7432; and

(iv) civil damages for unauthorized collection actions under 26 U.S.C. § 7433. (Docket No. 1).

79. Plaintiff and Defendant filed motions for summary judgment on January 28, 2007 and January 29, 2007, respectively. (Docket Nos. 13, 14). Magistrate Judge Black issued a Report and Recommendation with regard to both motions for summary judgment on April 26, 2007. (Docket No. 23).

80. This Court issued an order on July 25, 2007 adopting the Report and Recommendation of the Magistrate Judge, denying Plaintiff's Motion for Summary Judgment and granting in part and denying in part Defendant's Motion for Summary Judgment. (Docket No. 54); (*see* Docket No. 23).

81. The Court granted summary judgment to Defendant on Plaintiff's claims for:
(i) refunds of internal revenue taxes for periods in 1999–2002;

(ii) judicial review of the CDP determination for tax years 1999–2002; and

(iii) damages based on improper tax collection activities regarding the filing of the 1999–2002 lien and 2003–2004 lien pursuant to 26 U.S.C. § 7433. (Docket No. 54); (*see* Docket No. 23).

82. Plaintiff's refund claim was denied because Plaintiff failed to show reasonable cause for the abatement of penalties assessed for periods from 1999 to 2002. Penalties were assessed against the Plaintiff because it failed to file its employment tax reports and deposit tax payments. Plaintiff failed to timely file and deposit its

taxes because Ezequiel failed to properly do his job and the office manager failed to properly supervise Ezequiel. Courts have consistently held that the failure of a taxpayer's employee to file or pay taxes does not establish reasonable cause. (Docket Nos. 54, 62); (*see* Docket No. 23); *see McMahan v. Commissioner*, 114 F.3d 366, 371 (2d Cir.1997); *Conklin Bros. of Santa Rosa, Inc. v. United States*, 986 F.2d 315, 318 (9th Cir.1993); *Dogwood Forest Rest Home, Inc. v. United States*, 181 F.Supp.2d 554, 560–61 (E.D.N.C.2001).

83. The Court also denied Plaintiff's CDP appeal for 1999–2002, which claimed that the IRS did not follow proper statutory procedures prior to the filing of the 1999–2002 lien against the Plaintiff. On summary judgment, this Court held it was not an abuse of discretion for IRS Appeals Officer Darling to sustain the filing of the lien against Plaintiff covering periods in 1999–2002. (Docket No. 54). The IRS properly assessed tax liabilities and penalties against Plaintiff for those periods. Plaintiff received notices for those assessments and failed to pay the penalties within the required time. Under 26 U.S.C. § 6321, this was all that was required for the IRS to file a lien. Plaintiff also received notice of the filing of the liens as required by 26 U.S.C. § 6320. (Docket No. 54); (*see* Docket No. 23); (Pl.Ex. 75).

84. This Court also granted summary judgment on Plaintiff's 26 U.S.C. § 7433 claim. Plaintiff attempted to file an administrative claim pursuant to 26 U.S.C. § 7433 claiming that the filings of the 1999–2002 and 2003–2004 liens were unauthorized collection actions. This Court granted summary judgment to the Defendant on that claim because Plaintiff failed to exhaust all administrative remedies as required by 26 U.S.C. § 7433(d)(1). Plaintiff failed to file its claim with the proper authority and failed to include a specific dollar amount for the claim as required by

Treas. Reg. § 301.7433–1 (as amended in 1998). (Docket No. 54); *see Amwest Sur. Ins. Co. v. United States*, 28 F.3d 690, 696 (7th Cir.1994) (holding the procedural requirements for filing an administrative claim under the Treasury Regulations are to be strictly construed); *Venen v. United States*, 38 F.3d 100, 103 (3d Cir.1994).

85. The only claims remaining after summary judgment were:

(i) Plaintiff's claim for civil damages under 26 U.S.C. § 7432 for failure to release the 1999–2002 lien and 2003–2004 lien; and

(ii) judicial review of the CDP determination on the 2003–2004 lien. (Docket No. 54).

86. To prove a claim for failure to release a federal tax lien pursuant to 26 U.S.C. § 7432, Plaintiff must establish that an officer or employee of the IRS knowingly or negligently failed to release a lien even though (1) the liability on the lien had been satisfied; (2) the lien was unenforceable; or (3) the Plaintiff furnished a bond that was accepted by the IRS conditioned upon the payment of the amount covered by the liens. *See* 26 U.S.C. §§ 6325 (1998), 7432 (1988). To recover damages under 26 U.S.C. § 7432, Plaintiff must prove actual, direct economic damages "which, but for the actions of the defendant" in negligently failing to release the lien, would not have been sustained. 26 U.S.C. § 7432.

87. This Court has *de novo* judicial review of a CDP determination made by an IRS Appeals Officer where the validity of the underlying tax liability is properly at issue. *Sego. v. Commissioner*, 114 T.C. 604, 610, 2000 WL 889754 (2000); *Goza v. Commissioner*, 114 T.C. 176, 181–82, 2000 WL 283864 (2000). This Court must consider: " (1) whether the IRS met the requirements of any applicable law or administrative procedure prior to filing the notice of federal tax lien; (2) any issues

appropriately raised by the taxpayer relating to the unpaid tax; (3) challenges to the existence or amount of the tax liability; (4) offers of collection alternatives; and (5) whether the continued existence of the filed notice of federal tax lien represents a balance between the need for the efficient collection of taxes and the legitimate concern of the taxpayer that any collection be no more intrusive than necessary." Treas. Reg. §§ 301.6320–1(e); 301.6320–1(e), Q & A (E1) (as amended in 1999).

88. This Court held a three-day bench trial on those two sets of claims beginning September 11, 2007.

89. Plaintiff now also requests reconsideration this Court's denial of its claim for unauthorized collection action pursuant to 26 U.S.C. § 7433 as well as this Court's denial of Plaintiff's refund claim for the periods covered by the 1999–2002 lien. (Pl. Findings at pp. 18, 25).

## III. PLAINTIFF'S § 7432 CLAIM FOR FAILURE TO RELEASE THE 1999–2002 LIEN

90. The IRS must release a lien if: (1) the liability has been satisfied; (2) the lien is unenforceable; or (3) the taxpayer furnishes a bond to the IRS and the bond is accepted by the IRS. 26 U.S.C. § 6325.

91. "If any officer or employee of the Internal Revenue Service, knowingly, or by reason of negligence, fails to release a lien under [26 U.S.C. § 6325] on property of the taxpayer, such taxpayer may bring a civil action for damages against the United States." 26 U.S.C. § 7432.

### A. Burden of Proof

92. The taxpayer has the burden of proof on claims under 26 U.S.C. § 7432. *Bilzerian v. United States*, 86 F.3d 1067, 1070 (11th Cir.1996); *Miller v. United States*, 813 F.Supp. 715, 726 (N.D.Cal. 1992).

93. Plaintiff nonetheless claims that the burden of proof with respect to all factual issues regarding liability under 26 U.S.C. § 7432 shifts to the Defendant because of 26 U.S.C. § 7491. (Pl. Findings at p. 5).

94. The burden shifts to the United States in any court proceeding if the taxpayer "introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B." 26 U.S.C. § 7491 (1998).

95. Subtitle A of the Internal Revenue Code governs income taxes. 26 U.S.C. §§ 1, *et seq.* (2000). Subtitle B of the Internal Revenue Code governs estate and gift taxes. 26 U.S.C. §§ 2001, *et seq.* (2001). Subtitle C of the Internal Revenue Code governs employment taxes. 26 U.S.C. §§ 3101, *et. seq.* (1983).

96. Since the burden shifting provision of 26 U.S.C. § 7491 only applies to Subtitles A and B of the Internal Revenue Code, the provision does not apply to cases involving employment taxes. *See Charlotte's Office Boutique v. C.I.R.*, 121 T.C. 89, 102, 2003 WL 21783383 (2003); *Joseph M. Grey Public Accountant, P.C. v. C.I.R.*, 119 T.C. 121, 123, n. 2, 2002 WL 31052061 (2002). Cases involving penalties assessed for failure to pay employment taxes and whether Plaintiff established reasonable cause for those penalties are also outside the scope of the burden shifting provision of 26 U.S.C. § 7491. *See Bell v. United States*, No. 2:99–cv–1995, 2000 WL 1682983, at *2, 2000 U.S. Dist. LEXIS 15108, at *6 (E.D.Cal. Sept. 13, 2000).

97. All of the taxes, interest and penalties at issue in this case relate to employment taxes governed by Subtitle C. (*See* Complaint, Docket No. 1). This Court therefore finds that the burden shifting provision of 26 U.S.C. § 7491 does not apply to Plaintiff's claims.

98. The burden remains on Plaintiff to prove that the IRS "knowingly, or by reason of negligence" failed to release the

1999–2002 lien in violation of 26 U.S.C. § 7432. *See* 26 U.S.C. §§ 6235, 7432; *see also* 26 U.S.C. § 7491.

### B. Satisfaction of the Liabilities on the 1999–2002 Lien

#### 1. Abatement of Penalties to Satisfy the Liabilities in the 1999–2002 Lien

■ 99. During trial and throughout Plaintiff's Proposed Findings of Fact and Conclusions of Law (Docket No. 64), Plaintiff appears to try to re-litigate the issue of whether the penalties imposed for the period 1999–2002 should have abated for reasonable cause.

100. As a part of its order on summary judgment, this Court denied Plaintiff's refund claim for periods covered by the 1999–2002 lien (essentially a request for an abatement of penalties) for failure to show reasonable cause. (Docket Nos. 54, 62); *see supra* Section II. Plaintiff could not demonstrate reasonable cause when its employee, Ezequiel, simply failed to file Plaintiff's returns and pay Plaintiff's taxes and no supervisor caught Ezequiel's failure. (*Id.*)

101. Plaintiff requests this Court overturn this previous holding and appears to claim that if these penalties are abated, the liabilities on the 1999–2002 lien would be satisfied and the lien must be released. (*See* Pl. Findings at pp. 1–3).

102. The taxpayer has a heavy burden when establishing it had reasonable cause not to file, pay or deposit payroll taxes. *Staff IT, Inc. v. United States*, 482 F.3d 792, 801–02 (5th Cir.2007).

■ 103. There is no reasonable cause when the failure to pay or file returns is the result of inaction by one of Plaintiff's own employees. *See McMahan v. Commissioner*, 114 F.3d 366, 371 (2d Cir.1997) ("a taxpayer has an affirmative non-delegable duty to ensure that the appropriate forms ... are actually filed by the statuto-

ry deadline"); *Conklin Bros. of Santa Rosa, Inc. v. United States*, 986 F.2d 315, 318 (9th Cir.1993); *In re American Biomaterials Corp.*, 954 F.2d 919, 927 (3rd Cir. 1992); *Bell v. United States*, No. 2:99–cv–1995, 2000 WL 1682983, *2, 2000 U.S. Dist. LEXIS 15108, *6 (E.D.Cal. Sept. 11, 2000); *Dogwood Forest Rest Home, Inc. v. United States*, 181 F.Supp.2d 554, 560–61 (E.D.N.C.2001); (*see also* Docket Nos. 54, 62).

104. Plaintiffs cite *In re American Biomaterials Corp.*, 954 F.2d 919, 927 (3rd Cir.1992) in support of its argument that reasonable cause exists to abate the penalties assessed against Plaintiff for periods in 1999–2002. The *American Biomaterials* court held that "when the officers of a corporation commit criminal acts [e.g., embezzlement] against the corporation" and these crimes are "prove[n] to be the cause of the corporation's failures to fulfill its duties under the tax code[,]" the corporation may be able to establish reasonable cause. 954 F.2d at 927.

105. In *American Biomaterials*, two employees, MacKay, the president, Chief Executive Officer and chairman of the board of directors, and Russell, Chief Financial Officer and treasurer of the corporation, embezzled funds from the corporation. 954 F.2d at 922. These were the only officers responsible for filing tax returns and ensuring payment of those taxes. *Id.* Their embezzlement scheme, combined with their positions within the company, "incapacitated the corporation," rendering the corporation unable to file its tax returns and pay its taxes. *Id.* at 921.

106. While holding that the criminal actions of MacKay and Russell enabled the corporation to establish reasonable cause, the *American Biomaterials* court also noted that "[i]f a corporation has lax internal controls or fails to secure competent external auditors to ensure the filing of timely

tax returns and deposit and payment of taxes, it fails to show reasonable cause or absence of willful neglect and is itself liable for statutory penalties ..." 954 F.2d at 927 & 927, n. 8.

107. Plaintiff asserts that its particular situation is more compelling than the situation from *American Biomaterials* and requests this Court to reconsider its decision to deny Plaintiff's refund claim (i.e., abate the penalties for 1999–2002).

108. During trial, Plaintiff never alleged nor presented any evidence to show that Ezequiel, or any other employee of Plaintiff, engaged in any criminal action. In fact, Plaintiff provided no explanation or testimony at all as to why Ezequiel was not properly filing and paying Plaintiff's employment taxes.

109. Ezequiel simply neglected to perform the duties assigned to him as Plaintiff's employee to file returns and pay Plaintiff's employment taxes. *See supra* Section I at ¶¶ 5–9. Plaintiff's office manager should have been supervising Ezequiel's filing of the employment tax returns and deposits, but failed to recognize and correct Ezequiel's failure. *See supra* Section I at ¶¶ 6–9; (Pl.Ex. 6).

110. Plaintiff does not allege or provide any evidence that Ezequiel's failure to file or pay was part of some a criminal scheme to defraud the Plaintiff as was the case in *American Biomaterials. See* 954 F.2d at 921–22.

111. Plaintiff did not provide any evidence that Ezequiel's failure to pay involved a plot with his supervisor in a manner that might "incapacitate" Plaintiff from adequately supervising Ezequiel's actions as was the case in *American Biomaterials. See In re American Biomaterials Corp.*, 954 F.2d at 921–22.

112. Plaintiff, rather than present a more compelling situation than *American Biomaterials*, instead falls squarely into the category of having "lax internal controls or fail[ing] to secure competent external auditors" that even the court in *American Biomaterials* stated was insufficient to establish reasonable cause. *See* 954 F.2d at 927; *see also McMahan v. Commissioner*, 114 F.3d 366, 371 (2d Cir.1997); *Conklin Bros.*, 986 F.2d 315, 318 (9th Cir.1993); *Bell v. United States*, No. 2:99–cv–1995, 2000 WL 1682983, at *2, 2000 U.S. Dist. LEXIS 15108, at *6; *Dogwood Forest Rest Home, Inc. v. United States*, 181 F.Supp.2d 554, 560–61 (E.D.N.C.2001).

113. Plaintiff failed to establish reasonable cause for the abatement of penalties assessed for periods in 1999–2002. This Court re-affirms its decision from summary judgment denying Plaintiff's refund claims and request for the abatement of penalties for 1999–2002.

114. Plaintiff has not paid the penalties and some accrued interest covered by the 1999–2002 lien. (*See* Johnson, Day 2); (Pl. Ex. 78). By re-affirming the decision to deny Plaintiff's claim for abatement, these penalties and interest still remain outstanding liabilities covered by the 1999–2002 lien.

### 2. *Failure to Receive Notice of its Delinquency from the IRS*

115. Plaintiff also presented testimony to support its claim that Plaintiff is entitled to abatement for reasonable cause because the IRS did not notify Plaintiff of Plaintiff's failures to file employment tax returns, timely pay its taxes, and deposit its taxes. (*See* Hargis, Day 1); (Johnson, Day, 1, Day 2). In other words, Plaintiff asserts that the IRS was under some ongoing duty to inform Plaintiff that the Plaintiff was not filing tax returns or paying its taxes.

116. "When a return of tax is required ... the [taxpayer] required to make such return, shall, without assessment or notice and demand from the Secretary, pay such

tax . . . ." 26 U.S.C. § 6151. Plaintiff was responsible for filing its returns and paying its taxes on time and remained responsible to file those return and taxes after it missed the proper return deadline. The IRS does not have to provide the Plaintiff with any notice that Plaintiff failed to file its return or pay its taxes.

117. The lack of notification from the IRS that Plaintiff was failing to comply with its tax obligations therefore does not create reasonable cause to abate the penalties assessed for periods in 1999–2002.

### 3. *Conclusion*

118. Plaintiff did not provide any evidence or case law to persuade this Court to reconsider its finding on summary judgment that no reasonable cause existed to abate the penalties for 1999–2002.

119. There are still outstanding liabilities on the 1999–2002 lien. (*See* Johnson, Day 2). Plaintiff thus failed to demonstrate that the liabilities on the 1999–2002 lien have been satisfied and cannot support a 26 U.S.C. § 7432 claim on this ground.

### C. *Plaintiff's Claim the 1999–2002 Lien is Unenforceable*

1. *Procedural Considerations under 26 U.S.C. §§ 6320, 6321*

■ 120. IRS Appeals Officer Darling determined during Plaintiff's CDP appeal that the procedures set out in 26 U.S.C. § 6321 were met prior to the filing of the 1999–2002 lien. (Pl.Ex. 75). This Court held that Darling's finding was not an abuse of discretion and upheld the determination of the IRS Appeals Office on summary judgment. (Docket No. 54); (*see* Docket No. 23).

121. Nevertheless, Plaintiff appears to re-litigate the issue of whether it received the required notice and demand for the amounts on the 1999–2002 lien as required by 26 U.S.C. § 6321. (*See* Sobrevilla, Day 2).[3] Failure to follow statutory procedures prior to the filing of the 1999–2002 lien may make the lien unenforceable. *See* 26 U.S.C. §§ 6321 (1954), 6325.

122. Section 6321 requires that, prior to filing a lien, the IRS must: (1) make an assessment of the tax, including interest, additional amounts, and penalties owed by the taxpayer; (2) notify the taxpayer of the assessment; and (3) give the taxpayer time to pay the amount assessed. 26 U.S.C. § 6321. No other requirements must be met prior to the filing of a lien by the IRS. *See id.*

123. The IRS must also send notice of the filing of a lien within five business days after the filing of notice of the lien. 26 U.S.C. § 6320(a)(2)(C) (1998). Plaintiff admits to receiving this notice. (Pl.Ex. 56).[4]

---

**3.** The time to litigate these issues and to bring forth evidence in support of Plaintiff's position was when the Motions for Summary Judgment were pending—not after they have been ruled upon. Plaintiff presented evidence regarding the accuracy of the IRS Certificate of Assessments and Payments and the effect of a Form 834 appeal. Since these issues are applicable to mis Court's consideration of not only the 1999–2002 lien, but also live issues involved in this Court's analysis of the 2003–2004 lien, this Court will address Plaintiff's presentation of evidence on both issues as a part of this section. This Court, however, finds that Plaintiff has not presented any evidence that causes this Court to change its decision, made on summary judgment, that the Defendant followed all statutory procedures pursuant to 26 U.S.C. § 6321 prior to the filing of the 1999–2002 lien.

**4.** Plaintiff raises issues regarding the date on the notice of filing of the federal tax hen and the impact of this date on Plaintiff's filing of its CDP appeal. (Trial Tr., Day 2, Day 3). The failure to send proper notice after the filing of the lien does not invalidate the lien, but rather extends the time in which the taxpayer may file a CDP appeal. Treas. Reg. § 301.6320–1(a)(2), Q & A (A12) (as amended

124. Despite this Court's finding on summary judgment to the contrary, Plaintiff claims the Defendant cannot demonstrate Plaintiff ever received notice pursuant to 26 U.S.C. § 6321 because the IRS Certificate of Assessments and Payments (the "IRS transcripts") are inaccurate and Plaintiff's appeal of the IRS denial of penalty abatement required the Defendant to resend notice and demand under 26 U.S.C. § 6321 prior to the filing of a lien.

### 2. *Providing Notice Pursuant to 26 U.S.C. § 6321*

125. The IRS Certificate of Assessments and Payments attest to all the transactions that have posted to a taxpayer's account for a particular period. (*See* Sobrevilla, Day 2). These transcripts are the official records of the IRS. (*Id.*).

126. It is well-established that the IRS transcripts are presumptive proof that the IRS gave notice of the assessments and made demand for payment pursuant to 26 U.S.C. § 6321. *See, e.g., Geiselman v. United States*, 961 F.2d 1, 6 (1st Cir.1992).

127. The IRS transcripts clearly show that taxes, including interest and penalties, were assessed against Plaintiff for the periods covered on the 1999–2002 lien and that Plaintiff was sent notices of assessments for these periods. (*See, e.g.*, Def. Ex. 1 at pp. 15, 32). Plaintiff's representative admits that assessments were made. (Barrera, Day 1). Plaintiff also requests this Court make a finding of fact that "[i]n 2003 Plaintiff began receiving penalty notices ..." (Pl.Findings, p. 19). Johnson also testified that Plaintiff received penalty notices. (Johnson, Day 2).

128. Plaintiff, nevertheless, states that the testimony of IRS Revenue Officer Sobrevilla "destroyed" the integrity of the IRS transcripts regarding the IRS's notice and demand to Plaintiff for assessments made for periods in 1999–2002. (Pl.Findings, p. 12).

#### a. *Plaintiff's Impeachment of the IRS Transcripts*

129. Plaintiff presented testimony in an attempt to demonstrate that various indicators on the IRS transcripts signify events that did not actually occur or did not occur on the date designated in the IRS transcripts, thereby destroying the integrity of the transcripts. (*See, e.g.*, Trial Tr., Day 2). Plaintiff attacked the transcripts generally, frequently jumping between periods covered by the 1999–2002 lien and 2003–2004 lien. It appears Plaintiff sought to impeach the IRS transcripts generally, so that this Court would find the entire transcript was false, and that the transcripts could not be relied on as presumptive proof of IRS compliance with the statutory requirements of 26 U.S.C. § 6321.

#### i. *The "Federal Tax Lien" Indicator*

130. The IRS transcript for Plaintiff's third quarter 2003 Form 941 tax account lists the indicator "Federal Tax Lien" on April 29, 2005. (Def. Ex. 1 at pp. 164, 173). Among the many parts of the IRS transcript attacked, Plaintiff maintained that this indicator was incorrect because the 2003–2004 lien was not filed until May 9, 2005. (Trial Tr., Day 2, Day 3).

131. The IRS transcript for Plaintiff's third quarter 2001 and fourth quarter 2001

in 1999). Plaintiff was able to file its CDP appeal within thirty (30) days of receiving notice of the filing of the federal tax lien. Since Plaintiff's receipt of notice has no bearing on the enforceability of the lien and Plaintiff was able to file a CDP appeal within thirty days, this Court finds the issues Plaintiff raises regarding the receipt of notice under 26 U.S.C. § 6320 to have no bearing on Plaintiff's 26 U.S.C. § 7432 claim or any of Plaintiff's other claims.

Form 941 tax accounts list the indicator "Federal Tax Lien" on May 6, 2005. (Def. Ex. 1 at pp. 106, 114). Plaintiff maintained these indicators were also incorrect because the 1999–2002 lien was not filed until May 20, 2005. (Trial Tr., Day 2, Day 3).

132. Plaintiff stated that these alleged inaccuracies "confirmed the transcripts are incorrect" and that the transcripts should not be "entitled to any prima facie evidentiary value." (Trial Tr., Day 2).

133. IRS Revenue Officer Sobrevilla repeatedly explained that the date listed on the transcript next to the "Federal Tax Lien" indicator is the approximate date that the lien was requested. (Sobrevilla, Day 2, Day 3). The "Federal Tax Lien" indicator does not state the date the federal tax lien was actually filed. (*Id.* at Day 3).

134. Sobrevilla testified that the date he requests a lien is different from the date the lien is filed with the Texas Secretary of State. (Sobrevilla, Day 2). Liens requests are batched by the IRS system and then sent to the Texas Secretary of State when there are enough liens to justify sending a check to cover the lien filing fees. (*Id.*) The IRS transcript does not show the date the lien was filed with the Texas Secretary of State. (*Id. at* Day 3).

135. Sobrevilla requested that the 2003–2004 lien be filed on April 28, 2005. (Sobrevilla, Day 2). A lien indicator on April 29, 2005 fits within Sobrevilla's explanation of that the indicator represents the approximate date a request for filing of a lien was made.

136. Plaintiff provided no evidence to show why Sobrevilla's explanation was false or was not a reasonable explanation for the presence of the indicator.

137. As presented, Plaintiff's evidence regarding the "Federal Tax Lien" indica-

tor does not damage the integrity of the IRS transcripts.

ii. *Plaintiff Counsel's Failure to Receive Notice of the Filing of the Lien*

138. Plaintiff asserts that any transcript indicator showing that Plaintiff was sent notice of the filing of the lien pursuant to 26 U.S.C. § 6320 was incorrect because Plaintiff's counsel never received notice of the filing of the lien pursuant. (*See* Trial Tr., Day 3).

139. The only person entitled to receive notice pursuant to 26 U.S.C. § 6320 of the filing of a lien is the taxpayer named on the Notice of Federal Tax Lien. Treas. Reg. § 301.6320–1(a)(2), Q & A (A1) (as amended in 1999). "Person" is defined as the person liable to pay the tax due after notice and demand who refuses or neglects to pay the tax due (i.e., the taxpayer). *Id.* The taxpayer, and only the taxpayer, is entitled to notice. *See id.* at § 301.6320–1(a)(2), Q & A (A7) (as amended in 1999). Therefore, only the Plaintiff and not Plaintiff's counsel was entitled to notice under 26 U.S.C. § 6320.

140. While sending notice to counsel may have been appropriate, and perhaps even more professional, Plaintiff's counsel was not entitled to notice pursuant to 26 U.S.C. § 6320 and Plaintiff's evidence that it received notice and that its counsel did not, therefore, does not diminish the integrity of the IRS transcripts.

iii. *The "Statutory Notice of Intent to Levy" Indicator*

141. Several of the IRS transcripts involved in this case list the indicator "Statutory Notice of Intent to Levy." (*See* Trial Tr., Day 3).

142. Plaintiff avers that such notices of intent to levy were never sent.[5] (*Id.*)

---

**5.** This Court notes that statutory notices of intent to levy pursuant to 26 U.S.C. § 6331

have no bearing on the sending of statutory

143. Sobrevilla could not testify by looking at the transcript as to what the references to statutory notices of intent to levy referred. (Sobrevilla, Day 3).

144. Plaintiff's concerns regarding this indicator focused on the fact that notices of intent to levy were sent out while Sobrevilla was in charge of the case, but Sobrevilla never requested those notices and had no knowledge of those notices. (Trial Tr., Day 3).

145. Sobrevilla testified that Revenue Officers are not the only IRS agents authorized to send out a statutory notice of intent to levy. (Sobrevilla, Day 3). The IRS Automated Collection System is also authorized to send out statutory notices of intent to levy and could have sent out these notices independent of Sobrevilla's work on Plaintiff's accounts. (*Id.*)

146. Plaintiff did not present any evidence to show why Sobrevilla's alternate explanation for the presence of these indicators was false.

147. As presented, Plaintiff's argument regarding the "Statutory Notice of Intent to Levy" indicator does not overcome the well-established presumption of the integrity of the IRS transcripts.

#### iv. *The "Legal Suit" Indicator*

148. Plaintiff also contends that the IRS transcripts were inaccurate for listing a "Legal Suit" on June 13, 2005. (Trial. Tr., Day 3); (*see* Def. Ex. 2 at p. 3).

149. As entered on the IRS transcripts, a "Legal Suit" does not necessarily mean a lawsuit as it is understood in the context of litigation. (*See* Sobrevilla, Day 3). The "Legal Suit" indicator could represent an account in bankruptcy, pending litigation, or a CDP appeal. (*See id.*)

150. Plaintiff stated that even if "Legal Suit" could represent a CDP appeal, Plaintiff filed its CDP appeal on May 27, 2005, not June 13, 2005 as listed by the indicator. (Trial Tr., Day 3).

151. Sobrevilla testified that the "Legal Suit" indicator demonstrates when the CDP appeal posts to the IRS system, which is usually not the date the CDP request was filed. (*See* Sobrevilla, Day 3). Plaintiff's CDP appeal did not post on May 27, 2005, the day it was filed or sent to the IRS. (*See id.*)

152. Plaintiff did not produce any evidence to demonstrate why Sobrevilla's explanation for the indicator appearing on June 13, 2005 instead of May 27, 2005 was false.

153. As presented, Plaintiff's argument regarding the "Legal Suit" indicator does not damage the integrity of the IRS transcripts.

#### v. *Conclusion*

154. This Court disagrees with Plaintiff's contention that it "destroyed" the integrity of the IRS transcripts. None of Plaintiff's attempts to impeach the IRS transcripts were particularly effective and most were countered by a reasonable explanation from IRS Revenue Officer Sobrevilla.

155. Most notably, Plaintiff did not present any evidence in reference to the integrity of the indicators actually applicable to the live issues in this case: the indicators that assessment was made and notice sent pursuant 26 U.S.C. § 6321.

notice of assessments made by the IRS prior to the filing of a lien pursuant to 26 U.S.C. § 6321. Whether or not these notices of intent to levy were sent or received has no bearing on Plaintiff's claim regarding the re-

lease of liens under 26 U.S.C. § 7432. Plaintiff's argument concerning the indicator "Statutory Notice of Intent to Levy" is another attack by Plaintiff on the integrity of the IRS transcripts as a whole.

These are the only indicators actually relevant to Plaintiff's 26 U.S.C. § 7432 claim.

156. Plaintiff has not overcome the well-established presumption that a transcript notation that statutory notice was sent to the Plaintiff satisfies the statutory requirements of 26 U.S.C. § 6321. *See Geiselman v. United States*, 961 F.2d 1, 6 (1st Cir.1992).

157. Since the IRS transcripts clearly indicate that Plaintiff received statutory notice for the periods covered by the 1999–2002 lien, this Court reaffirms its holding from summary judgment that Defendant complied with the statutory requirements of 26 U.S.C. § 6321 prior to filing the 1999–2002 lien.

b. *Filing Liens During Plaintiff's Appeal of the Denial of Penalty Abatement*

158. Plaintiff also asserts that its appeal of the IRS denial of Plaintiff's request for the abatement of penalties required the IRS to reissue statutory notice pursuant to 26 U.S.C. § 6321. (Pl.Findings, p. 13).

159. On January 14, 2004, Plaintiff filed a Form 843 request for the abatement of penalties, including periods from 1999 to 2002. (Pl.Ex. 6).

160. Plaintiff's request for abatement of penalties was denied by IRS Revenue Officer Alice Rios ("Rios") on October 14, 2004 for failure to demonstrate reasonable case. (Pl.Ex. 32). Rios' determination was forwarded to the Appeals Division for review. (*Id.*)

161. The IRS Appeals Division formally denied the appeal on May 9, 2005. (Pl. Ex. 51).

162. Plaintiff asserts that the IRS had to resend notice of Plaintiff's tax liability after this final ruling May 9, 2005 because the amounts Plaintiff owed were not known until the IRS completed its analysis of Plaintiff's appeal. (Pl.Findings, p. 13). Plaintiff claims that the letter from Sobrevilla dated May 27, 2005 was the first notice and demand for payment. (*See* Pl. Ex. 54). Plaintiff's argument follows that any lien filed prior to June 6, 2005 (which would include all liens at issue in this case) would be invalid and unenforceable for failure to provide notice and demand prior to the filing of the lien. *See* 26 U.S.C. § 6321.

163. Plaintiff provides this Court no authority to show that appealing the denial of a Form 843 request for abatement of penalties requires the IRS to resend statutory notices pursuant to Section 6321, especially when the appeal does not change the amounts in question.[6]

164. The requirements of 26 U.S.C. § 6321 were met by the initial statutory notice and demand sent to the Plaintiff by the IRS. *See* 26 U.S.C. § 6321.

165. Plaintiff has given this Court no persuasive reason to reconsider its decision on summary judgment that the IRS met the requirements of 26 U.S.C. § 6321 through assessments and notices sent beginning in 2003.

6. In its summary judgment motion and during trial, Plaintiff appeared to confuse the statutory requirements regarding the sending of a final demand prior to levying assets pursuant to 26 U.S.C. § 6331 and the sending of statutory notice pursuant to 26 U.S.C. § 6321. A "final demand" is only necessary prior to *levying* the assets of a taxpayer, not prior to filing a lien. *Compare* 26 U.S.C. § 6321 *with* 26 U.S.C. § 6331. At points during trial, Plaintiff asserted that it should have been sent a final demand prior to the filing of a lien. On the second day of trial, however, Plaintiff acknowledged that the IRS did not need to send a "final demand" within the meaning of 26 U.S.C. §§ 6330, 6331 prior to filing liens. (*See, e.g.*, Trial Tr., Day 2). The sending of a final demand therefore does not enter this Court's analysis of the validity of the filing of liens against the Plaintiff.

166. Since the IRS met the requirements of 26 U.S.C. § 6321 prior to filing the 1999–2002 lien, the 1999–2002 lien is enforceable.

### D. *Release of the 1999–2002 Lien Pursuant to 26 U.S.C. § 7432*

167. There are three ways in which a Plaintiff can demonstrate that a lien should be released by the IRS: (1) the liabilities on the lien have been satisfied; (2) the lien is unenforceable; or (3) Plaintiff furnished a bond to the IRS which was accepted by the IRS. 26 U.S.C. § 6325.

168. Plaintiff did not satisfy the liabilities on the 1999–2002 lien nor did it demonstrate that the 1999–2002 lien was unenforceable for failure to provide statutory notice.

169. Plaintiff did not allege or present any evidence to show that it furnished a bond for the 1999–2002 lien that was accepted by the IRS. (*See, e.g.,* Johnson, Day 1); (Barrera, Day 1); *see also* 26 U.S.C. § 6325.

170. Plaintiff failed to carry its burden of proof on any of the three methods for showing that the 1999–2002 lien should have been released pursuant to 26 U.S.C. § 6325. Because a claim under 26 U.S.C. § 7432 requires a violation of 26 U.S.C. § 6325, Plaintiff's claim regarding the release of the 1999–2002 lien fails. *See* 26 U.S.C. § 7432.

### IV. Plaintiff's § 7432 Claim for Failure to Release the 2003–2004 Lien

171. Plaintiff also filed a claim under 26 U.S.C. § 7432 regarding the failure of the IRS to release the 2003–2004 lien. Plaintiff raises many of the same legal and factual arguments this Court just discussed regarding the 1999–2002 lien in Section III.

172. Plaintiff states that the 2003–2004 lien should have been released because: (i) Plaintiff allegedly made an offer to furnish a bond that was rejected by the IRS; (ii) the lien was unenforceable due to the failure of the IRS to follow the procedural requirements of 26 U.S.C. §§ 6320 & 6321; or (iii) the liability covered by the 2003–2004 lien was satisfied on May 10, 2005. (*See* Pl. Findings, pp. 13–14).

### A. *Furnishing a Bond to Cover the Liabilities of the 2003–2004 Lien*

173. A lien can be released if the taxpayer furnishes a bond to the IRS and that bond is accepted by the IRS. 26 U.S.C. § 6325.

174. Johnson, on behalf of the Plaintiff, considered offering a bond on May 10, 2005 to prevent the filing of the 2003–2004 lien. (Barrera, Day 1); (Hargis, Day 1); (Johnson, Day 1).

175. Sobrevilla, on behalf of the IRS, could not agree to a bond at the time of the meeting. (Barrera, Day 1); (*see* Hargis, Day 1); (Johnson, Day 1). The acceptance of any bond or pledge was left to Sobrevilla's manager. (Barrera, Day 1).

176. The Plaintiff never furnished a bond to the IRS. (Barrera, Day 1); (Johnson, Day 2).

177. While Plaintiff may have considered furnishing a bond to the IRS at one point, Plaintiff never followed through with the bond, and the IRS never accepted a bond from the Plaintiff, as required for a release of lien under 26 U.S.C. § 6325. Plaintiff, therefore, presents no factual basis for asserting the "furnishing of a bond" as a ground for the release of the 2003–2004 lien.

### B. *Unenforceability of the Lien*

178. Plaintiff states that the 2003–2004 lien was unenforceable because the IRS failed to follow the procedural requirements for providing notice in 26 U.S.C.

§§ 6320 & 6321 prior to filing the lien. (*See* Pl. Findings, pp. 13–14).

179. Plaintiff's arguments mirror its arguments on not receiving statutory notice for the periods covered by the 1999–2002 lien. (*See* Pl. Findings, p. 13); *supra* Section III. Plaintiff again attacks the accuracy of the IRS transcripts and the effect of Plaintiff's appeal of the IRS's denial of penalty refunds and abatement. (Pl.Findings, p. 12).

### 1. *Notice and Demand to Plaintiff Pursuant to 26 U.S.C. § 6321*

#### a. *Impeachment of the IRS Transcripts*

180. Plaintiff again directs this Court to the testimony of IRS Revenue Officer Sobrevilla, stating that the testimony "destroyed" the integrity of IRS transcripts listing statutory notifications pursuant to 26 U.S.C. § 6321 sent to Plaintiff regarding the tax periods covered by the 2003–2004 lien. (Pl.Findings, p. 12).

181. As stated in Section III of this decision, Plaintiff failed to present evidence, at least to satisfy this factfinder, that would upset the presumptive accuracy of the IRS transcripts. *See Geiselman v. United States*, 961 F.2d 1, 6 (1st Cir.1992); *see also supra* Section III. Plaintiff's arguments regarding the integrity of the IRS transcripts do not even address the specific concerns of this case: whether the IRS made assessments and sent notice of those assessments pursuant to 26 U.S.C. § 6321.

#### b. *Proper Notification Pursuant to 26 U.S.C. § 6321*

182. Plaintiff asserts that it failed to receive proper statutory notice of assessments as required by 26 U.S.C. § 6321 prior to the filing of the 2003–2004 lien by the IRS. This Court first turns to the events that led to the assessment of penalties against Plaintiff for periods in 2003–2004 and then to the evidence offered by Defendant showing that the IRS sent Plaintiff statutory notice according to 26 U.S.C. § 6321.

183. Plaintiff's employees did not receive adequate training on the Texas State Bank software used by Plaintiff to pay its employment taxes electronically through the IRS EFTPS system. *See supra* Section I at ¶¶ 25–33. This lack of training led to errors in submitting payments to the IRS. (*See id.*)

184. Each time errors were made in the submission of data, the IRS received Plaintiff's deposits and payments a few days late. *See supra* Section I at ¶ 34; (Def. Ex. 1 at pp. 152–153, 163, 172).

185. The IRS assessed penalties against Plaintiff for late payments for these tax periods in 2003–2004. (Def. Ex. 1 at pp. 152–153, 163, 172).

186. The IRS sent Plaintiff a "Statutory Notice of Balance Due" for each period covered by the 2003–2004 lien satisfying the notice requirement of 26 U.S.C. § 6321. (Def. Ex. 2 at p. 24) (sending notice for Plaintiff's 2003 Form 940 on April 19, 2004); (Def. Ex. 1 at p. 167) (sending notice for third quarter 2003 Form 941 on December 29, 2003); (*Id.* at p. 176) (sending notice for fourth quarter 2003 Form 941 sent March 15, 2004); (*Id.* at 182) (sending notice for first quarter 2004 Form 941 sent December 27, 2004); *see Geiselman v. United States*, 961 F.2d 1, 6 (1st Cir.1992)., 961 F.2d at 6. The IRS sent Plaintiff notices of balance for its second quarter 2004 Form 941 on October 18, 2004, December 27, 2004 and January 31, 2005.

187. Prior to the filing of the 2003–2004 lien, Plaintiff never fully paid all the taxes, interest and penalties owed for these periods. (*See, e.g.*, Johnson, Day 2).

188. Since the IRS made assessments, sent notice of those assessments, and

Plaintiff failed to pay the amounts owed, the IRS satisfied the requirements of 26 U.S.C. § 6321 prior to filing the 2003–2004 lien. *See* 26 U.S.C. § 6321.

189. On May 9, 2005, the IRS filed a federal tax lien against Plaintiff reflecting both a Form 940 liability for 2003 and Form 941 liabilities for the third quarter of 2003 through the second quarter of 2004. (*See* Sobrevilla, Day 2). The liabilities totaled $101,279.02. (*See id.*)

190. This Court finds that Defendant properly made assessments, sent statutory notice, and did not receive payment from Plaintiff, satisfying the requirements of 26 U.S.C. § 6321 prior to filing the 2003–2004 lien against Plaintiff.

191. On April 29, 2005, the IRS sent a notice of filing of a federal tax lien for periods in 2003–2004 ("2003–2004 lien") to Plaintiff. (*See* Def. Ex. 1 at pp. 164, 173, 181); (Def. Ex. 2 at p. 22); (*see also* Pl.Ex. 52). Plaintiff admits receiving a notice of federal tax lien. (Pl.Ex. 56); *see also supra* Section I at ¶ 123, n. 4.

192. The 2003–2004 lien was therefore enforceable as filed and not subject to release on this ground. *See* 26 U.S.C. § 6325.

193. Plaintiff's argument that the 2003–2004 lien was unenforceable because it fully paid the liabilities on the lien as of May 10, 2005 is also unpersuasive. (*See* Barrera, Day 1). This payment occurred one day after the lien was filed on May 9, 2005 and has nothing to do with the enforceability of the lien *when filed. See* 26 U.S.C. § 6321.

### 2. *The Effect of an Appeal of a Denial of Penalty Abatement*

194. Plaintiff again fails to present any authority to show that the IRS was required to resend statutory notice after Plaintiff appealed the IRS denial of the abatement of penalties. *See supra* Section III. Once the IRS sent the original notices and Plaintiff refused to pay, the IRS was entitled to file the lien. *See* 26 U.S.C. § 6321. Plaintiff's filing of an appeal does not effect the enforceability of the 2003–2004 lien. *See id.*

### C. *Satisfaction of the Liabilities Covered by the 2003–2004 Lien*

195. Plaintiff asserts that the 2003–2004 lien should have been released because the liabilities covered by the lien were satisfied on May 10, 2005. (*See* Pl. Findings, pp. 13–14).

196. "[T]he Secretary shall issue a certificate of release of a lien imposed with respect to any internal revenue tax not later than 30 days after the day on which ... the Secretary finds that the liability for the amount assessed, together with all interest in respect thereof, has been full satisfied ...." 26 U.S.C. § 6325(a)(1).

197. "It is the IRS, not the taxpayer, who must make the determination required by Section 6325" that the liabilities on a lien have been fully satisfied. *Kabakjian v. United States,* 92 F.Supp.2d 435, 442 (E.D.Pa.2000) (quoting *Husek v. Internal Revenue Service,* 778 F.Supp. 598, 605 (N.D.N.Y.1991)).

198. The Secretary makes a "finding" that the liabilities on a lien are fully satisfied on the earlier of: (i) the date on which the district director of the district in which the taxpayer currently resides or the district in which the lien was filed finds full satisfaction; this finding must be made as soon as practicable after the taxpayer provides payment in full of the outstanding liabilities owed on a lien; or (ii) the date on which such district director receives a request for a certificate of release of lien in accordance with Treas. Reg. § 401.6325–1(f) (1982), together with any information which is reasonably necessary for the district director to conclude that the lien has been fully satisfied. Treas. Reg.

§§ 301.7432–1(b) (1992), § 401.6325–1(c)(1) (1982).

199. Plaintiff asserts that the liabilities on the 2003–2004 lien were fully paid on May 10, 2005. (*See* Sobrevilla, Day 2).

200. Defendant counters that the IRS was not obligated to release the lien because: (i) new liabilities created by Plaintiff's amended return and the combined annual wage reconciliation, together with the IRS failure to make the adjustments specified in Sobrevilla's analysis, kept the liabilities for the periods on the 2003–2004 lien from ever being completely satisfied or; (ii) Plaintiff's filing of its CDP appeal removed Sobrevilla's jurisdiction and authority to release the lien. (*See* Sobrevilla, Day 2); (Def. Findings at p. 10).

1. *Adjustments and a Payment Discussed at May 10th Meeting Satisfied the Plaintiff's Tax Liabilities for 2003–2004*

201. The May 10, 2005 meeting and subsequent events were set out in detail above. *See* Section. I at ¶¶ 46–50.

202. At the conclusion of the May 10, 2005 meeting, Plaintiff gave Sobrevilla a check for $1,716.47 to cover the outstanding liabilities for tax periods in 2003–2004. (*See* Johnson, Day 1); (Hargis, Day 1); (Barerra, Day 1). The remainder of the liabilities for 2003–2004 would be extinguished by adjustments and reallocations of Plaintiff's tax payments made by Sobrevilla on the IRS system. (*See* Barrera, Day 1); (Sobrevilla, Day 2).

203. Sobrevilla's May 27, 2005 letter verified what had been discussed at the May 10, 2005 meeting: that as a result of the adjustments Sobrevilla had made and Plaintiff's check for $1,716.47, the liabilities for 2003–2004 had been fully paid. (Pl.Ex. 54). The letter stated, in part:

As agreed, I have completed the analysis of your account and have made all the necessary adjustments that include

transfers of erroneously applied credits, adjustments and abatements of penalties and interest. The purpose of this letter is to provide you [Plaintiff], as close as possible, a breakdown of the remaining liability. (*Id.*)

204. At the time of the sending of the May 27, 2005 letter, Sobrevilla had determined that the lien could be released. (Sobrevilla, Day 2).

2. *The Periods Covered by the 2003–2004 Lien Never Posted as Fully Paid on the IRS System*

205. As stated previously, Sobrevilla could not release the 2003–2004 lien through the IRS system until all the periods for the 2003–2004 lien registered as "status 12" (e.g., fully paid). (Sobrevilla, Day 2, Day 3).

206. Through some clerical error some of the transfers and adjustments Sobrevilla and Plaintiff agreed to on May 10, 2005 were never made. (Sobrevilla, Day 3). This directly contradicts Sobrevilla's May 27, 2005 letter, which expressly stated, "As agreed, I have completed the analysis of your account *and have made all the necessary adjustments that include transfers of erroneously applied credits, adjustments and abatements of penalties and interest.*" (Pl.Ex. 54) (emphasis added).

207. The adjustments Sobrevilla said had been made in his May 27, 2005 letter still have not been completed. (Sobrevilla, Day 3).

3. *Plaintiff Filed a CDP Appeal*

208. Plaintiff filed its CDP appeal on June 9, 2005. (Pl.Ex. 56).

209. Pursuant to IRS procedures, filing a CDP appeal removed the matter from SobreviUa's jurisdiction. (Pl.Ex. 57). Sobrevilla testified that removing the case from his jurisdiction prevented him from

·

ensuring that the lien was released. (*See* Sobrevilla, Day 2).

210. Once the IRS finds the lien liabilities have been satisfied, the IRS "shall" release the lien. 26 U.S.C. § 6325. When a Plaintiff files a CDP appeal this does not relieve the IRS of a pre-existing duty to release a lien if the liabilities on that lien had been satisfied. *See id.* If the IRS was obligated to release the lien prior to Plaintiff's filing of a CDP appeal, that obligation was not, therefore, tolled or negated by Plaintiff's filing of the CDP appeal. Just like Plaintiff's appeal of the IRS's denial of the abatement of penalties does not keep the IRS from filing a lien against the Plaintiff, likewise, the IRS cannot avoid an obligation to release a fully satisfied tax lien simply because Plaintiff exercised its right to file a CDP appeal.

4. *Additional Assessments to Tax Periods in 2003–2004 After May 10, 2005*

a. *Plaintiff Files an Amended Return on May 23, 2005 for a Period on the 2003–2004 Lien*

211. As stated earlier, Plaintiff filed an amended Form 941 return for the first quarter of 2004 on May 23, 2005. (Def. Ex. 14 at p. 6); (Johnson, Day 2); *see supra* Section I at ¶¶ 51–55. Johnson signed the return as president of Plaintiff. (*Id.*); (Johnson, Day 2).

212. The amended return created an additional liability of $5,734.82 on Plaintiff's first quarter 2004 Form 941 account. (Sobrevilla, Day 3); (Def. Ex. 1 at p. 182). This amount posted to the account on May 27, 2005. (*Id.*)

213. Plaintiff testified that liabilities were paid when amended returns were filed. (*See* Johnson, Day 2). Sobrevilla testified this additional amount is still outstanding. (Sobrevilla, Day 3).

214. Sobrevilla knew of this amended return because he was involved in actually "securing" the return. (Sobrevilla, Day 3). He knew this amended return existed when he sent Plaintiff a letter indicating that Plaintiff had no liability for periods in 2003–2004. (*See id.*)

215. Sobrevilla does not recall including the additional liability imposed by the amended return as a part of the analysis and adjustments documented in his May 27, 2005 letter to the Plaintiff. (Sobrevilla, Day 3). Sobrevilla testified the additional assessment of $5,734.82 would create liabilities on the 2003–2004 lien not addressed in the May 27, 2005 letter. (*See id.*)

216. This Court must now square Sobrevilla's testimony that he knew of and was even involved in securing the amended return, but apparently did not consider the additional liability in his May 27, 2005 letter. (*See* Sobrevilla, Day 3).

217. It is clear to this Court that Sobrevilla knew of the amended return yet still issued a letter to Plaintiff indicating that Plaintiff's accounts had been fully paid. (*See* Pl.Ex. 54); (Sobrevilla, Day 3).

218. The facts, therefore, support a finding that the additional liability from the amended return was: (1) fully paid upon filing by Plaintiff (*see* Johnson, Day 2); (2) included in Sobrevilla's May 27, 2005 analysis; or (3) used in a manner which misled Plaintiff, because Sobrevilla's May 27, 2005 letter made it appear as if the amended return had been included in his analysis. All of these findings support sustaining the determination of the May 27, 2005 letter that the liabilities on the 2003–2004 lien had been satisfied.

219. This Court thus finds that Plaintiff's filing of the amended return did not change the fact that the IRS determined that the liabilities on the 2003–2004 lien were fully satisfied by Plaintiff's check and the accompanying adjustments as of May 27, 2005. Sobrevilla, with full knowledge

of the return, sent Plaintiff a letter saying not only that Plaintiff no longer owed liabilities for periods in 2003–2004, but that the IRS actually owed Plaintiff for overpayments to those periods. (*See* Pl.Ex. 54).

b. *The June 2005 Combined Annual Wage Reconciliation*

220. The IRS conducted a combined annual wage reconciliation on Plaintiff's tax accounts, including Plaintiff's fourth quarter 2003 Form 941 account. (Sobrevilla, Day 3).

221. During a combined annual wage reconciliation, the IRS matches the payroll tax returns submitted by the taxpayer to the IRS with Social Security wages, W2 forms and W3 forms submitted to the Social Security Administration. (Sobrevilla, Day 3).

222. If the Social Security records and payroll tax returns do not match, the IRS sends out a notice advising the taxpayer that the figures do not correspond. (Sobrevilla, Day 3). The IRS then proposes an adjustment to Plaintiff's tax accounts. (*Id.*)

223. If the taxpayer does not respond to the proposed IRS adjustment, the IRS makes the adjustment based on its prior reconciliation. (Sobrevilla, Day 3).

224. As a result of the combined annual wage reconciliation procedure stated above, the IRS assessed additional tax and interest of $5,735.62 and penalties of $1,849.54 against Plaintiff on June 13, 2005 for the fourth quarter of 2003 Form 941 account. (Def. Ex. 1 at pp. 175–76); (Sobrevilla, Day 3).

225. Statutory notice went out regarding this assessment on March 6, 2006. (Sobrevilla, Day 3); (*see* Def. Ex. 1 at pp. 175–75).

226. Defendant provided no evidence of when the IRS sent the Plaintiff notice of a proposed adjustment. It is unclear whether the March 6, 2005 notice was the IRS's proposed adjustment or whether the notice reflects an adjustment made after the Plaintiff had already been notified of a proposed adjustment.

227. Because the statutory notice was not sent until March 2006 and the Defendant did not provide evidence to this Court that Plaintiff had notice of any additional assessment prior to March 2006, the combined annual wage reconciliation will not impact this Court's determination of whether Plaintiff satisfied the liabilities on the 2003–2004 lien in May 2005. The additional liability imposed by the combined annual wage reconciliation may impact the tax periods in 2003–2004 beyond the scope of this case, but it does not impact the time frame and claims presently before this Court.

D. *Defendant Should Have Released the 2003–2004 Lien Pursuant to 26 U.S.C. § 6325*

228. The Secretary makes a "finding" that the liabilities on a lien are fully satisfied on the earlier of: (i) the date on which the district director of the district in which the taxpayer currently resides or the district in which the lien was filed finds full satisfaction or (ii) the date on which such district director receives a request for a certificate of release of lien in accordance with Treas. Reg. § 401.6325–1(f) (1982), together with any information which is reasonably necessary for the district director to conclude that the lien has been fully satisfied. Treas. Reg. § 301.7432–1(b) (1992).

1. *Request for Certificate of Release of Lien*

229. The district director makes a "finding" if the taxpayer provides the director with proof of full payment with respect to the entire tax liability and provides a proper request for certificate of

release of lien. Treas. Reg. § 401.6325–1(c)(2) (1982).

230. A request for a certificate of release of lien must: (1) be submitted in writing to the district director of the district in which the notice of Federal tax lien was filed; (2) be marked for attention of the Chief, Special Procedures Function; (3) contain the name and address of the taxpayer; (4) contain a copy of the notice of federal tax lien; and (5) contain the grounds upon which the issuance of a release is sought. Treas. Reg. § 401.6325–1(f) (1982).

231. "Proof of full payment" requires the taxpayer to provide the district director: (i) an internal revenue cashier's receipt reflecting full payment of the tax liability in question; (ii) a canceled check in an amount sufficient to satisfy the tax liability for which the release is being sought; or (iii) any other manner of proof acceptable to the district director. Treas. Reg. § 401.6325–1(d) (1982).

232. If a taxpayer follows the requirements of § 401.6325–1(c) (2), the district director is on constructive notice of information provided in a request for a certificate of release of lien. *See Kabakjian*, 92 F.Supp.2d 435, 444 (E.D.Pa.2000) (citing *Steffen v. United States*, 952 F.Supp. 779, 783 (M.D.Fla.1997)). This constructive notice begins the day a proper request for certificate of release of lien and proof of payments are filed and begins the running of the 30–day period, during which the Secretary must release the lien. *Id.* at 444–45.

233. On June 24, 2005, Plaintiff filed a request for certificate of release of lien. (Pl.Ex. 58). The request was submitted to the District Director in Cincinnati, marked for the attention of the "Chief, Special Procedures Function." (*Id.*) The name and address of Plaintiff were provided as well as a copy of the Notice of Federal Tax Lien for the 2003–2004 lien. (*Id.*)

234. The request for certificate of release of lien listed as grounds for release that on "May 10, 2005, Mr. Don Johnson, Sr., President of the taxpayer, hand delivered a check to Ricardo Sobrevilla in the approximate amount of $1,716.47 in complete payment of *ALL* outstanding Form 940 and Form 941 taxes owed by the taxpayer, for the years and all quarters within 2003 and 2004." (Pl.Ex. 58) (emphasis in original).

235. Plaintiff followed the proper procedures for submitting a request for certificate of release of lien. *Compare* Treas. Reg. § 401.6325–1(f) (1982) *with* (Pl.Ex. 58).

236. Plaintiff, however, did not include proof of full payment to the district director in any form (e.g., a receipt or copy of the check given to Sobrevilla on May 10, 2005). *See* Treas. Reg. § 401.6325–1(c)(2) (1982); (d); (Pl.Ex. 58).

237. The procedural provisions of the Treasury Regulations are strictly construed. *See Amwest Sur. Ins. Co. v. United States*, 28 F.3d 690, 696 (7th Cir.1994).

238. Because Plaintiff failed to comply with the requirement to send proof of full payment to the district director, the district director could not have a made a "finding" pursuant to Treas. Reg. § 401.6325–1(c)(2) (1982).

### 2. *Finding by the District Director*

239. The district director can also make a "finding" by making a determination that the entire tax liability listed in a notice of federal tax lien has been fully satisfied. Treas. Reg. § 401.6325–1(c)(1) (1982).

240. The district director must make this determination "as soon as practicable after tender of payment" that satisfies the outstanding liabilities on the lien. Treas. Reg. § 401.6325–1(c) (1) (1982).

241. Plaintiff tendered payment to Sobrevilla for the remaining liabilities on the 2003–2004 lien on May 10, 2005 in the form of a check for $1,716.47. *See* Treas. Reg. § 401.6325–1(c)(1) (1982). This full payment was confirmed by Sobrevilla's letter of May 27, 2005. (*See* Pl.Ex. 54).

242. The district director was then required to make a determination and find that the 2003–2004 lien should be released "as soon as practicable." *See* Treas. Reg. § 401.6325–1(c) (1) (1982).

243. The district director never made such a determination.

244. This Court must now determine at what point after May 10, 2005 it would have been practicable for the district director to have made his or her determination. *See* Treas. Reg. § 401.6325–1(c)(1) (1982). This Court could find no guidance from the case law or the regulations on how to apply the "as soon as practicable" standard.

245. Sobrevilla memorialized the discussions and determinations from the May 10, 2005 meeting in his May 27, 2005 letter. (Pl.Ex. 54).

246. The May 27, 2005 letter, written with knowledge of the amended return, stated that all adjustments had been made and there was no longer any liability for periods in 2003–2004, and in fact, there was a large positive credit for the periods covered by the 2003–2004 lien. (Pl.Ex. 54).

247. Despite Sobrevilla's letter stating that the adjustments had been completed, (Pl.Ex. 54), these adjustments have not been made because of an IRS clerical error. (Sobrevilla, Day 3).

248. This clerical error, made by IRS employees, does not justify failing to release the 2003–2004 lien when the liabilities should have been satisfied based on the agreements made at the May 10, 2005 meeting. Just as Plaintiff could not previously defend its failure to timely pay its taxes based on the errors of its employees, neither can the IRS escape its obligations based on the failures of IRS employees.

249. This Court finds no reason why a determination on May 27, 2005 that payment had been tendered and the liabilities on the 2003–2004 lien were satisfied would not be "as soon as practicable" when Plaintiff had tendered payment nearly three weeks earlier on May 10, 2005.

250. For the purpose of the release of the 2003–2004 lien, this Court finds that the district director should have made a determination on May 27, 2005 that the liabilities on the 2003–2004 lien had been satisfied.[7]

251. From this constructive determination that the liabilities on the 2003–2004 lien were satisfied, the Secretary then had 30 days from May 27, 2005 in which to release the 2003–2004 lien. The 2003–2004 lien should have, therefore, been released on or before June 26, 2005.[8]

---

7. If the amended return actually changed the result of the May 10, 2005 meeting, the IRS should have: (1) released the 2003–2004 lien; (2) sent a letter to Plaintiff revising its prior position stated on May 27, 2005; and (3) started the process of filing the 2003–2004 lien again so that it reflected only the new liabilities for those tax periods.

8. If the district director could not have made a constructive determination that the 2003–2004 lien should have been released on May

27, 2005, the Court holds alternatively that the district director should at least have been on notice as of June 24, 2005 upon the filing of the request for certificate of release of lien. While this request was insufficient to be a proper request for release of lien pursuant to Treas. Reg. § 401.6325–1(c)(2) (1982), the request yet again informed the district director of his or her requirement to make a determination "as soon as practicable" pursuant to Treas. Reg. § 401.6325–1(c)(1) (1982). A constructive determination on June 24,

252. The 2003–2004 lien has still has not been released.

### E. *The Negligence of the IRS in Failing to Release the Lien*

■ 253. "If any officer or employee of the Internal Revenue Service knowingly, or by reason of negligence, fails to release a lien under 26 U.S.C. § 6325 on property of the taxpayer, such taxpayer may bring a civil action for damages against the United States . . . ." 26 U.S.C. § 7432(a).

254. The IRS should have released the 2003–2004 lien within 30 days of the district director's constructive determination on May 27, 2005. *See* 26 U.S.C. § 6325; Treas. Reg. § 401.6325–1(c) (1) (1982).

255. The failure to release the 2003–2004 lien was due to the negligence of either the district director of the IRS, the clerical staff of the IRS or Sobrevilla, or a combination of all of these.

256. On May 10, 2005, IRS Revenue Officer Sobrevilla informed Plaintiff that as a result of Plaintiff's payment of $1,716.47, that Plaintiff would no longer have any liabilities for tax periods in 2003–2004.

257. Plaintiff filed an amended return on May 23, 2005, which Sobrevilla personally secured. With knowledge of this return, Sobrevilla sent Plaintiff a letter saying that the adjustments and transfers discussed on May 10, 2005 were complete, and that, not only does Plaintiff not owe any money to the IRS for periods in 2003–2004, but in fact, there is an account balance in Plaintiff's favor for periods in 2003–2004. (*See* Pl.Ex. 54).

258. Without any further notice from the IRS that the situation had changed, Plaintiff submitted a request for certificate

of release of lien on June 24, 2005. (Pl.Ex. 58).

259. Sobrevilla may have been negligent in failing to secure a determination from the IRS district director that the liability on the 2003–2004 lien had been satisfied so that the lien could be released.

260. Sobrevilla may also have been negligent in providing repeated statements, both on May 10, 2005 and May 27, 2005, to Plaintiff that its liabilities for 2003–2004 had been satisfied.

261. Additionally, the clerical staff of the IRS was negligent in failing to complete the adjustments to Plaintiff's tax accounts to reflect what had already been determined by Sobrevilla so that the IRS system would list Plaintiff's 2003–2004 accounts as "status 12" and the 2003–2004 lien could thus be released. (Sobrevilla, Day 2).

262. While it is unclear how much the negligence of Sobrevilla or the clerical staff of the IRS contributed to the district director's inaction, the IRS district director was negligent in failing to make a determination as soon as practicable that the liabilities on the 2003–2004 lien had been satisfied so that the lien could be released.

263. Section 7432 permits a finding of liability if "any" officer or employee of the IRS was negligent in failing to release the lien. Since either Sobrevilla, the clerical staff or the district director of the IRS, or a combination thereof, was negligent, Defendant therefore violated 26 U.S.C. § 7432(a) and is subject to damages to the extent proven by Plaintiff under 26 U.S.C. § 7432(b).

---

2005 would begin the running of the thirty day period in which the IRS must release the lien and would have therefore required the hen to be released on or before July 24, 2005,

and this Court alternatively finds this to be the latest date by which the 2003–2004 lien should have been released.

## V. DAMAGES

■ 264. "... [U]pon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of—(1) actual, direct economic damages sustained by the plaintiff, which, *but for the actions of the defendant* would not have been sustained, plus (2) the costs of the action." 26 U.S.C. § 7432(b) (emphasis added).

265. The taxpayer has the burden of proof on claims under 26 U.S.C. § 7432. *Bilzerian v. United States,* 86 F.3d 1067, 1070 (11th Cir.1996); *Miller v. United States,* 813 F.Supp. 715, 726 (N.D.Cal. 1992).

### A. *Plaintiff's Actual, Direct Economic Damages*

266. Plaintiff prevailed on its claim under 26 U.S.C. § 7432(a) for failure to release the 2003–2004 lien. *See supra* Section IV.

267. Plaintiff now must prove it sustained actual, direct economic damages that, "but for" Defendant's failure to release the 2003–2004 lien, Plaintiff would not have suffered. *See* 26 U.S.C. § 7432(b); *Bilzerian,* 86 F.3d at 1070; *Miller,* 813 F.Supp. at 726.

268. Johnson testified to the following damages at trial: (1) loss of a favorable floor plan; (2) loss of the use a corporate cash management account; (3) loss of a personal cash management account; (4) loss of the ability to endorse paper to sell more cars; (5) loss of sales of purchase-lease vehicles; (6) loss of factory incentives; and (7) loss of personal retirement savings. (Johnson, Day 1).

269. Johnson testified as to possible damages to his personal retirement savings and personal income. (*See, e.g.,* Johnson, Day 1). This Court, however, can only consider damages sustained by the taxpayer Plaintiff, Don Johnson Motors, Inc, and not indirect damages to Plaintiff's employees, including Johnson. *See* 26 U.S.C. § 7432(b).

### 1. *Floor Planning*

270. Plaintiff finances its new, used and rental car business, in part, through floor plans. (*See* Johnson, Day 1).

271. "Floor plan lending is a form of retail goods inventory financing in which each loan advance is made against a specific piece of collateral. As each piece of collateral is sold by the dealer, the loan advance against that piece of collateral is repaid." COMPTROLLER OF THE CURRENCY, COMPTROLLER'S HANDBOOK, SECTION 210, FLOOR PLAN LOANS 3 (1998), *available at* http://www.occ.treas.gov/handbook/floorplanl.pdf.

272. Johnson testified the filing of a lien against Plaintiff prevented it from shopping its floor plan, causing damages to Plaintiff. (Johnson, Day 1).

273. Chrysler Financial would not floor plan with Plaintiff because, "[t]hey ran a UCC, found a tax lien filed, and they said, 'No go. Let us know when you get it cleared up.' " (Johnson, Day 1).

274. Ford Motor Credit continued to floor plan with Plaintiff because Plaintiff had been a client for over ten years. (Johnson, Day 1). Ford Motor Credit frequently asks Plaintiff about the status of its liens. (*Id.*)

275. Wells Fargo found out Plaintiff had a tax lien and did not want to floor plan with Plaintiff. (Johnson, Day 1, Day 2). Plaintiff lost the ability to finance with Wells Fargo at a rate two-and-a-half percent less than the rate offered by Chrysler, Ford Motor Credit and Hyundai. (Johnson, Day 1).

276. Plaintiff's average new and used monthly floor plan is $3,500,000. (Johnson, Day 1).

277. Johnson testified that this loss of favorable floor planning with Wells Fargo cost Plaintiff approximately two percent of $3,000,000. (Johnson, Day 2). He testified this was approximately $5,400 per month. (*Id.*)

278. Plaintiff must prove that damages to its floor planning would not have occurred "but for" Defendant's failure to release the 2003–2004 lien. *See* 26 U.S.C. § 7432(b); *Bilzerian*, 86 F.3d at 1070; *Miller*, 813 F.Supp. at 726. Since this Court has held that the 1999–2002 lien, the far greater of the two liens, does not need to be released, *see supra* Section HI, Plaintiff must prove that the Defendant's failure to release the 2003–2004 lien was, by itself, sufficient to cause the damages set out by the Plaintiff.[9] *See* 26 U.S.C. § 7432(b); *Bilzerian*, 86 F.3d at 1070; *Miller*, 813 F.Supp. at 726.

279. Johnson testified that financing companies, such as Wells Fargo, were " . . . jumpy about me having a tax lien. They didn't know how they were going to be affected by it . . . ." (Johnson, Day 2).

280. It makes no difference to Plaintiff's financiers whether Plaintiff has a lien for $100,000 or $200,000. (Johnson, Day 2).

281. Neither Johnson nor any other witness testified that, but for the failure to release the 2003–2004 lien, Plaintiff would not have suffered these damages. Plaintiff presented no evidence that the failure to release the 2003–2004 lien, by itself, caused all or any of Plaintiff's damages.

282. This Court has determined that the 1999–2002 lien is valid and does not need to be released. *See* Section III. The liabilities on the valid 1999–2002 lien were greater than those imposed on the released 2003–2004 lien. (*See* Pl.Ex. 52). Given the testimony, the 1999–2002 lien, in and of itself, could have caused all of Plaintiff's damages.

283. While the 2003–2004 liens must be released, this Court finds Plaintiff failed to prove that the failure to release this lien was the "but for" cause of any floor planning damages Plaintiff may have suffered as required by 26 U.S.C. § 7432.

#### 2. *Cash Management Account*

284. Johnson testified that Plaintiff's and his personal Cash Management Accounts with Ford Motor Credit suffered as a result of the liens. (Johnson, Day 1).

285. Johnson testified that he lost personal income of about $40,000 in 2006. (Johnson, Day 1). This Court will not consider Johnson's personal loss of income as only Plaintiff Don Johnson Motors, Inc. is before this Court.

286. Plaintiff's corporate Cash Management Account with Ford Motor Credit suffered a loss of "[m]aybe" $30,000 during 2006. (Johnson, Day 1). The next day, Johnson testified that this damage only totaled $23,000. (Johnson, Day 2).

287. Regarding Plaintiff's cash management account, Plaintiff also presented no evidence that the failure to release the 2003–2004 lien was the "but for" cause of damages to the account as required by 26 U.S.C. § 7432.

#### 3. *Loss of Factory Incentives*

288. On the first day of trial, Johnson testified that as a result of the liens, Plaintiff lost its incentives from Primus Automotive. (Johnson, Day 1). These incentives were between $2,300 and $3,200 per

---

**9.** This Court notes that in this case, as a practical matter, Plaintiff must prove the causation element by a combination of: (i) demonstrating the 2003–2004 lien was the "but for" cause of Plaintiff's damages; and, given the rulings of this Court upholding the 1999–2002 lien, (ii) showing the 1999–2002 lien did not cause these same damages.

month. (*Id.*) The next day of trial, Johnson testified the average loss from these incentives was approximately $2,800 per month from the time the liens were filed. (*Id.* at Day 2).

289. Johnson also testified that the loss of incentives could range from $25,000 to $50,000 per year, "depending on how much business we do and how much they get." (Johnson, Day 1).

290. Plaintiff no longer receives incentives from Ford. (Johnson, Day 1).

291. Plaintiff does not have incentives with Hyundai or Chrysler because neither company will floor plan with Plaintiff. (Johnson, Day 1).

292. Regarding Plaintiff's factory incentives, Plaintiff presented no evidence that the failure to release the 2003–2004 lien was the "but for" cause of damages to these incentives as required by 26 U.S.C. § 7432.

### 4. Dealer–Endorsed Contracts

293. Plaintiff's inability to floor plan prevented it from endorsing contracts with potential customers. (Johnson, Day 1). This cost Plaintiff sales. (*Id.*)

294. Johnson testified that he could not put a figure on the amount of damages for dealer-endorsed contracts because "that would be a summation on my part [about] how many we needed." (Johnson, Day 2). He continued, however, stating that the lost income based on the loss of dealer-endorsed contracts ranged from $2,200 per month to $50,000 or $60,000 per year. (*Id.*)

295. Regarding Plaintiff's dealer-endorsed contracts, Plaintiff again presented no evidence that the failure to release the 2003–2004 lien was the "but for" cause of damages to these contracts as required by 26 U.S.C. § 7432.

### 5. Purchase–Lease Vehicles

296. Each month, "probably about five or six" purchase-lease vehicles were returned to Plaintiff and Johnson testified that Plaintiff would have liked to buy some of them. (Johnson, Day 1). Plaintiff could not purchase these vehicles because it did not have floor plans with various dealers. (*Id.*)

297. Johnson testified that he could not put a number on the damages for the loss of sales of purchase-lease vehicles. (Johnson, Day 2).

298. This Court cannot speculate what damages Plaintiff may have suffered from its inability to buy purchase-lease vehicles and, therefore, would not award damages for these lost sales even if Plaintiff had otherwise proven the elements of a 26 U.S.C. § 7432 damage claim.

299. Additionally, Plaintiff presented no evidence that the failure to release the 2003–2004 lien was the "but for" cause of damages to the sales of purchase-leave vehicles as required by 26 U.S.C. § 7432.

### 6. Inaccurate Publication of the Lien in the Rio Grande Valley Business Journal

300. The Rio Grande Valley Business Journal reported Plaintiff as having a lien of $10,127,902. (Pl.Ex. 68).

301. Johnson testified that A.C. Green ("Green") from South Padre Island Bank called to inform him about this publication. (Johnson, Day 1).

302. The IRS never filed a $10,127,902 lien against Plaintiff. (*See* Trial Tr., Day 2). In actuality, the IRS filed a $101,279.02 lien against Plaintiff for liabilities in 2003–2004. (*See id.*)

303. Plaintiff's Exhibit 68 was marked on by Green. (*See* Pl.Ex. 68). It appears Green inserted a mark to show that the

correct value of the lien was $101,279.02. (*Id.*)

304. Plaintiff did not provide any evidence that any other person, apart from Green, read or considered the publication of the lien in the Rio Grande Valley Business Journal.

305. Plaintiff did not provide any evidence that it did any business with Green or South Padre Island Bank.

306. Plaintiff does not provide any evidence that inaccurate publication of the lien in the Rio Grande Valley Business Journal had any impact on its business.

307. Furthermore, Plaintiff provides this Court with no reason to believe the IRS had anything to do with this particular journal's reporting or that the IRS should have any responsibility when a particular journal misreports on a lien filing.

308. Plaintiff, therefore, failed to prove or demonstrate any damages stemming from the inaccurate publication of the lien in the journal.

### B. *Costs and Fees*

309. "A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under [28 U.S.C. § 2412], and the amount sought, including an itemized statement from any attorney … representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed." 28 U.S.C. § 2412(d)(1)(B); *see* 26 U.S.C. § 7430(c)(4)(A)(ii).

310. A party seeking fees must also demonstrate that the position of the United States was not substantially justified. 28 U.S.C. § 2412(d)(1)(B). Whether or not the position of the United States was sub-stantially justified shall be determined on the basis of the record. *Id.*

311. Plaintiff has thirty (30) days from the entry of this order to submit an application for fees in accordance with 26 U.S.C. § 7430 and 28 U.S.C. § 2412. This Court **ORDERS** that any application for fees be accompanied by a brief explaining the factual and legal basis for Plaintiff's application for fees. Defendant will have twenty (20) days, pursuant to local rules, to respond to Plaintiff's application for fees. Plaintiff's brief in support of application for fees must discuss the impact of Plaintiff's success only on its 26 U.S.C. § 7432 claim for failure to release the 2003–2004 lien and on the remand of certain aspects of Plaintiff's 2003–2004 CDP determination, as well as this Court's holding that Plaintiff is not entitled to damages on its successful 26 U.S.C. § 7432 claim on its ability to claim reimbursement.

## VI. RECONSIDERATION OF PLAINTIFF'S UNAUTHORIZED COLLECTION ACTIONS CLAIM UNDER 26 U.S.C. § 7433

312. This Court denied Plaintiff's 26 U.S.C. § 7433 claim on summary judgment because Plaintiff failed to exhaust all administrative remedies prior to filing this claim with the Court. (Docket No. 54); *see* 26 U.S.C. § 7433(d)(1) (1998).

313. Plaintiff now asks this Court to reconsider its ruling on Plaintiff's 26 U.S.C. § 7433 claim. (Pl. Findings at p. 18).

314. Plaintiff's findings submitted to this Court after trial allege that Defendant committed unauthorized collection actions when it: (1) misallocated taxpayer designated payments; and (2) filed federal tax liens against Plaintiff without satisfying 26 U.S.C. § 6321. (*See* Pl. Findings at p. 26).

315. The only possible source of 26 U.S.C. § 7433 claims arise from Plaintiff's

letter dated July 16,2005. (Pl.Ex. 64). This letter claimed that "notices of federal tax liens were prepared with incorrect tax amounts and filed in violation of the taxpayer's rights and the [IRS] procedures and are unenforceable." (*Id.*)

316. The July 16, 2005 letter makes no mention of Defendant's alleged misallocation of payments. (*See* Pl.Ex. 64). Plaintiff provides this Court with no evidence that it ever filed an administrative claim with the IRS alleging that payments had been misallocated. (*See* Pl. Exs. 64–67). Accordingly, this Court affirms its ruling on summary judgment and **DENIES** Plaintiff's 26 U.S.C. § 7433 claim for the misallocation of taxpayer payments for failure to exhaust administrative remedies.

### A. Plaintiff's Failure to Follow Regulatory Procedure Prior to Filing its Claim

317. Plaintiff's July 16, 2005 letter states that the filing of the 1999–2002 lien and the 2003–2004 lien constituted unauthorized collection actions pursuant to 26 U.S.C. § 7433. (*See* Pl.Ex. 64). This Court held on summary judgment that Plaintiff failed to file this claim with the proper authority and failed to include a specific dollar amount for the claim as required by Treas. Reg. § 301.7433–1 (as amended in 1998). (Docket No. 54).

318. An administrative claim shall be sent in writing to "the Area Director, Attn: Compliance Technical Support Manager of the area in which the taxpayer currently resides." Treas. Reg. § 301.7433–1(e)(1) (as amended in 1998).

319. The procedural provisions in the Treasury Regulations for filing administrative claims are to be strictly construed. *See Amwest Sur. Ins. Co. v. United States,* 28 F.3d 690, 696 (7th Cir.1994).

320. If a plaintiff addresses an administrative claim to an IRS Revenue Officer rather than to the individual specified in the Treasury Regulations, the plaintiff has failed to comply with the Treasury Regulations. *See Venen v. United States,* 38 F.3d 100, 103 (3d Cir.1994); *Amwest Sur. Ins. Co.,* 28 F.3d at 695–96; *see also* Treas. Reg. § 301.7433–1 (as amended in 1998). This failure to comply "deprives a court of jurisdiction" over the administrative claim. *Venen,* 38 F.3d at 103.

321. The claim must also include the dollar amount of the claim, including any damages that have not yet been incurred but which are reasonably foreseeable. Treas. Reg. § 301.7433–1(e)(2)(iv) (as amended in 1998). Plaintiff must also provide copies of any available substantiating documentation or evidence. *Id.*

322. Plaintiff claims it satisfied the requirements of 26 U.S.C. § 7433 when it sent its July 16, 2005 letter stating an administrative claim for damages. (*See* Pl. Exs. 64, 66, 67).

323. Plaintiff sent an administrative claim to "District Director, Attn: Chief, Special Procedures Function" in Austin, Texas on July 16, 2005. (Pl.Ex. 64). Plaintiff should have sent the claim to the "Area Director, Attn: Compliance Technical Support Manager." *See* Treas. Reg. § 301.7433–1(e)(1) (as amended in 1998). Plaintiff therefore filed its claim with the wrong IRS personnel. *See* Treas. Reg. § 301.7433.1–(e)(1) (as amended in 1998); (Pl.Ex. 64).

324. On July 21, 2005, the IRS informed Plaintiff that all requests needed to be sent to the Internal Revenue Service Center in Covington, Kentucky. (Pl.Ex. 66).

325. Plaintiff gave this Court no evidence at summary judgment or new evidence or testimony at trial to demonstrate that it ever re-filed its administrative claim with proper IRS personnel or with the proper IRS office in Kentucky.

326. Plaintiff states that the evidence before this Court demonstrates that Plaintiff satisfied the requirements of Treas. Reg. § 301.7433–1(e)(1) by sending the claim to IRS Revenue Officer Sobrevilla, and that Sobrevilla's work history record establishes the administrative claim was forwarded to the proper office on July 15, 2005. (*See* Pl.Ex. 85, pp. 48); (Pl. Findings at p. 26–27). Plaintiff did not satisfy the requirements of Treas. Reg. § 301.7433–1(e)(1) by filing its claim with Sobrevilla. *See Venen v. United States,* 38 F.3d 100, 103 (3d Cir.1994); *Amwest Sur. Ins. Co.,* 28 F.3d at 695–96

327. By failing to send its claim to the proper IRS authority, Plaintiff deprived this Court of jurisdiction over Plaintiff's administrative claim. *See Venen,* 38 F.3d at 103.

328. Plaintiff provided this Court with no evidence or testimony that it ever filed an administrative claim with an IRS Compliance Technical Support Manager, as required by Treas. Reg. § 7433.1–(e) (1).

329. An administrative claim under 26 U.S.C. § 7433 must also include the dollar amount of the claim, including copies of any available substantiating documentation or evidence. Treas. Reg. 301.7433–1(e)(2)(iv) (as amended in 1998).

330. In addition to Plaintiff's failure to file its administrative claim with the proper authority, Plaintiff did not provide evidence substantiating the dollar amount listed in its administrative claim, failing to satisfy Treas. Reg. § 301.7433–1(e)(2)(iv). (*See* Pl. Ex. 64).

331. The record gives this Court no reason to overturn its previous holding on summary judgment that Plaintiff failed to follow the proper statutory and regulatory procedures for filing its July 16, 2005 administrative claim. Therefore, that ruling is re-affirmed.

**B.  *The Merits of the July 16, 2005 Administrative Claim***

332. Plaintiff claims that "notices of federal tax liens were prepared with incorrect tax amounts and filed in violation of the taxpayer's rights and the [IRS] procedures and are unenforceable." (Pl.Ex. 64).

333. As stated above in Sections III and IV, this Court finds that Defendant did not violate 26 U.S.C. § 6321 when it filed either the 1999–2002 or 2003–2004 liens. *See supra* Sections III, IV. Defendant made assessments and provided proper statutory notice for taxes due for the periods on the 1999–2002 and 2003–2004 lien. Plaintiff did not pay the penalties owed. Defendant therefore properly proceeded with the filing of the 1999–2002 and 2003–2004 liens; the filing of the liens were not unauthorized collections actions. *See* 26 U.S.C. § 6321.

334. While the lien for 2003–2004 should have been released, this does not mean the lien was improper as filed. *See supra* Section IV. Thus, even if this Court were to overlook the failure of Plaintiff to properly file an administrative claim, Plaintiff's 26 U.S.C. § 7433 claim fails on the merits.

**VII.  *De Novo* REVIEW OF THE COLLECTIVE DUE PROCESS ("CDP") DETERMINATION FOR 2003–2004**

335. The underlying tax liability for the years 2003–2004 was not considered in Plaintiff's Collection Appeals Review, therefore this liability was properly raised during Plaintiff's CDP appeal and can be considered by the Court here on review. *See* Treas. Reg. § 301.6320–1(e) (as amended in 1999); (Def. Findings at p. 2).

336. Because the underlying tax liability was properly raised as a part of Plaintiff's CDP appeal, this Court has *de novo*

review over the CDP determination. *Sego. v. Commissioner,* 114 T.C. 604, 610, 2000 WL 889754 (2000); *Goza v. Commissioner,* 114 T.C. 176, 181–82, 2000 WL 283864 (2000); *see Christopher Cross, Inc. v. United States,* 461 F.3d 610, 612 (5th Cir. 2006); (Docket Nos. 23, 54).

337. The taxpayer has the burden of proof on claims filed under 26 U.S.C. § 6320. *Gibbs v. C.I.R.,* No. 24037–05L, 2006 WL 2052880, at *3 (T.C. July 24, 2006).

338. This Court must consider: (1) whether the IRS met the requirements of any applicable law or administrative procedure prior to filing the notice of federal tax lien; (2) any issues appropriately raised by the taxpayer relating to the unpaid tax;[10] (3) challenges to the existence or amount of the tax liability; (4) offers of collection alternatives; and (5) whether the continued existence of the filed notice of federal tax lien represents a "balance between the need for the efficient collection of taxes and the legitimate concern of the taxpayer that any collection be no more intrusive than necessary." Treas. Reg. §§ 301.6320–1(e); 301.6320–1(e), Q & A (E1) (as amended in 1999).

### A. *Abatement of Penalties for Periods Covered bv the 2003–2004 Lien*

339. At the CDP hearing, a taxpayer may raise challenges to the existence or amount of the underlying tax liability for any tax period if the person did not receive any statutory notice of deficiency for such tax liability or did not otherwise have an opportunity to dispute such tax liability. Treas. Reg. § 301.6320–1(e) (as amended in 1999).

340. Plaintiff seeks review of whether it was entitled to an abatement of penalties for the periods covered by the 2003–2004 lien. Because the underlying tax liability for the years 2003–2004 was not considered in Plaintiff's Collection Appeals Review, this liability is properly before this Court here on review. *See* Treas. Reg. § 301.6320–1(e) (as amended in 1999); (Def. Findings at p. 2).

341. Plaintiff's request for the abatement of penalties assessed for 2003–2004 centers on Plaintiff's use of Texas State Bank software to electronically pay its employment taxes through the IRS EFTPS system. (*See* Pl.Ex. 33); Section I at ¶¶ 25–41.

342. Plaintiff argues that there was reasonable cause for the abatement of penalties in 2003–2004 because: (i) the Bank admitted it failed to properly train Plaintiff's employees, (*see* Johnson, Day 1); or (ii) Plaintiff discharged its duties by submitting payments, because money was taken out of its account by the Bank though not paid over into the IRS accounts. (*See* Hargis, Day 1); (Barrera, Day 1).

343. In response, Defendant presented evidence that Plaintiff purposefully chose not to train its own employees on the new software, and, in the alternative, that even if the Bank failed to properly train Plaintiff's employees, Plaintiff is nonetheless liable for penalties that resulted from the failures of the Bank, who, at all pertinent times, was an agent of the Plaintiff. (Pl. Ex. 32); (*see* Sobrevilla, Day 3).

#### 1. *Texas State Bank's Training on the New Software*

344. The factual background behind Plaintiff's problems with the Texas State

---

10. Plaintiff raised several issues as a part of the CDP hearing. (*See* Pl.Ex. 75). The only record of issues raised by Plaintiff during its CDP appeal is the Notice of Determination. (*Id.*) Therefore, this Court will consider those issues along with the statutory requirements for a CDP hearing set out in 26 U.S.C. § 6320 and Treas. Reg. § 301.6320–1(e) (as amended in 1999).

Bank software and payments through the IRS EFTPS–Through a Financial Institution system were set out in Section I. *See* Section I at ¶¶ 25–41.

345. IRS Revenue Officer Rios investigated these issues regarding Plaintiff and the Bank's software and training and put her findings in a letter to Plaintiff on October 14, 2004. (Pl.Ex. 32). While Rios's letter ultimately focused on the denial of Plaintiff's abatement requests for periods in 1999–2002, the letter reveals the results of Rios's investigation into the cause of the penalties for the periods in 2003–2004 as well. (*See* Pl.Ex. 32).

346. Rios's letter stated in pertinent part:

> I spoke to your two employees and in my discussions, it was determined they should visit with Texas State Bank to see if there was some reason or some error caused by the bank that required them to hold your checks for a 24–hour period prior to processing them as Federal Tax Deposits. I was told that the bank did not agree that they had committed any error. (Pl.Ex. 32)

347. To the contrary, the Bank admitted it was at fault in failing to train Plaintiff's employees. (Pl.Ex. 33).

348. It does not appear that Rios knew or considered that the Bank admitted its failure to properly train Plaintiff's employees when she denied the abatement of penalties for 2003–2004. (*See* Pl.Ex. 32).

2. *Plaintiff's Responsibilities under EFTPS–Through a Financial Institution*

349. Plaintiff was required by the IRS to submit its employment tax payments electronically. Plaintiff utilized Texas State Bank and the EFTPS–Through a Financial Institution system to electronically pay Plaintiff's employment taxes. *See* Section I at ¶¶ 3, 25–28.

350. The EFTPS–Through a Financial Institution system involves the taxpayer authorizing a financial institution to initiate Automated Cleaning House ("ACH") credit transactions on the taxpayer's behalf. HANDBOOK FOR EFTPS at 5.

351. A taxpayer using EFTPS–Through a Financial Institution enrolls in EFTPS, designates a financial institution, and provides the taxpayer's account number and information for use in EFTPS. HANDBOOK FOR EFTPS at pp. 7–8.

352. The taxpayer controls the initiation of a tax payment. HANDBOOK FOR EFTPS at p. 13. Each payment is initiated by the taxpayer through the financial institution. *Id.* at p. 5.

353. The financial institution originates an ACH credit transaction on behalf of the taxpayer, debiting the taxpayer's bank account and sending the credit to the Treasury's General Account. HANDBOOK FOR EFTPS at p. 5. In an ACH credit transaction, the financial institution, upon receiving instructions from a taxpayer, sends payment to the appropriate Treasury Department account. Rev. Proc. 98–32, 1998–3 C.B. 935.

354. The ACH credit transaction must be specially formatted and delivered to the designated EFTPS account by a specified time. HANDBOOK FOR EFTPS at p. 13. The financial institution is responsible for originating the ACH Credit tax payment on behalf of its customer. *Id.*

355. On the tax due date, taxpayers may go online or call EFTPS Customer Service to verify that the ACH payment was received and processed by EFTPS. HANDBOOK FOR EFTPS at pp. 13, 26.

356. When using EFTPS–Through a Financial Institution, the taxpayer is responsible for ensuring its tax payments are delivered to EFTPS by the tax due date. HANDBOOK FOR EFTPS at pp. 26, 38;

*see* Treas. Reg. § 301.6302–1(i)(6) (1967); Rev. Proc. 98–32, 1998–10 C.B. 935. Payment will be deemed made at the time the funds are paid into the appropriate Treasury Department account. Rev. Proc. 98–32, 1998–10 C.B. 935. Any delay results in a penalty assessed to the taxpayer. HANDBOOK FOR EFTPS at pp. 26,38 (citing 26 U.S.C. § 6656); *see* Rev. Proc. 98–32, 1998–10 C.B. 935.

357. To establish that the taxpayer properly paid its taxes through the EFTPS system, the taxpayer must present the IRS acknowledgment number for the taxes paid from the financial institution's account on behalf of the taxpayer. Rev. Proc. 98–32, 1998–12 C.B. 935. A taxpayer does not demonstrate proper payment by simply showing money was transferred out of its account into the financial institution's account. *Id.*

358. If it is determined that the failure to pay is based on reasonable cause, the taxpayer will not be penalized. HANDBOOK FOR EFTPS at p. 38. Generally, to demonstrate reasonable cause, the taxpayer must show that "the remitting financial institution or Treasury Financial Agent was provided with the proper information in a timely manner and that sufficient funds were available in the taxpayer's account." *Id.; see id.* at 27.

359. The Financial Institution Handbook for EFTPS from the Treasury Department demonstrates that in EFTPS transactions, the Bank acts as an agent of the taxpayer. *See* HANDBOOK FOR EFTPS at 5–8, 26, 38.

360. Since the Bank is an agent of the Plaintiff, the Plaintiff does not discharge its duty to pay its employment taxes until the deposit is actually received by the IRS. *See* HANDBOOK FOR EFTPS at pp. 26, 38; *see* Treas. Reg. § 301.6302–1(i)(6) (1967); Rev. Proc. 98–32, 1998–10 C.B. 935. Plaintiff is therefore incorrect in arguing that it fulfilled its duties to submit payments when it submitted payment information to the Bank using the Bank software. *See also* Rev. Proc. 98–32, 1998–12 C.B. 935.

361. To demonstrate reasonable cause, Plaintiff must prove that it delivered proper instructions to the Bank in a timely manner and that sufficient funds were available in Plaintiff's account, but that the Bank failed to originate the credit. *See* HANDBOOK FOR EFTPS at pp. 27, 38.

### 3. *Conclusion*

362. As part of the CDP determination, Appeals Officer Darling upheld past decisions by Rios and Appeals Officer Robles to deny Plaintiff's request for penalty abatements. (Pl.Ex. 75).

363. It appears that none of these decisions considered the Bank's concession that it failed to properly train Plaintiff's employees or whether the information Plaintiff did submit to the Bank established the reasonable cause set out in the EFTPS Handbook. (*See* Pl.Ex. 32).

364. The facts support a finding that Rios and the IRS received the letter from the Bank accepting responsibility for and explaining the failure in training on the new software. *See supra* Section I at ¶¶ 35–37. Further, the facts show that Plaintiff sent information to the Bank necessary to transmit payments, just not in duplicate as required by the software. *See id.* at ¶¶ 30–33.

365. These issues, which are quite probative of reasonable cause, should have been considered by Darling during as a part of his CDP determination of reasonable cause.

366. Plaintiff's remedy on judicial review of Plaintiff's CDP claim is for this Court to remand the matter for the IRS to conduct a second CDP hearing that includes the considerations stated by this Court. *See Mesa Oil, Inc. v. United*

*States,* No. 1:00–cv–851, 2000 U.S. Dist. LEXIS 19420, at *1, 19 (D.Colo. Dec. 5, 2000); *Comfort Plus Health Care, Inc. v. C.I.R.,* No. Civ. 04–4963JNEJGL, 2005 WL 1656914, at *2–3, 2005 U.S. Dist. LEXIS 14491, at *6–7 (D.Minn. July 14, 2005). This Court therefore **REMANDS** Plaintiff's CDP determination for further proceedings on the issue of whether penalties assessed for periods covered by the 2003–2004 lien should be abated.

### B. *Fulfillment of Administrative Procedures Under 26 U.S.C. §§ 6320 & 6321*

367. Plaintiff requested a CDP hearing "with regard to the Notices of Federal Tax Liens filed by the [IRS] on May 10, 2005 and all the irregularities associated with the preparation, and filing of the tax liens." (Pl.Ex. 75).

368. Darling determined there "were taxes due on the accounts and the three legal requirements needed to file a lien had been met." (Pl.Ex. 75); *see* 26 U.S.C. § 6321.

369. This Court held, *supra,* in Section IV that the IRS followed all procedural requirements set out in 26 U.S.C. §§ 6320 & 6321 regarding the filing of the 2003–2004 lien. Darling's finding regarding the compliance of the IRS with the administrative procedures on the filing of the liens is affirmed.

### C. *Satisfaction of the Lien*

370. Plaintiff's request for a CDP hearing alleged that "Don Johnson Motors, Inc. has paid its outstanding tax liabilities and some of the liabilities disclosed on the tax liens are barred by the applicable statute of limitations." (Pl.Ex. 75).

371. Darling determined that there were balances on the periods listed in the liens at the time the liens were filed. (Pl. Ex. 75). The lien could not be released

"until each period (on the lien) ha[d] been satisfied in full." (*Id.*)

372. This Court held, *supra,* in Section IV that the 2003–2004 lien should have been released based on the payment and adjustments stemming from the May 10, 2005 meeting. *See supra* Section IV.

373. This Court **REMANDS** Plaintiff's CDP claim to include consideration of Plaintiff's satisfaction of the liability owed on the 2003–2004 lien based on the events of May 10, 2005 and this Court's order that the 2003–2004 lien be released.

### D. *Unauthorized Collection Practices*

374. Plaintiff's CDP request also alleged that the IRS "engaged in unauthorized collection actions and [ ] violated its own procedures in the collection of tax liabilities." (Pl.Ex. 75).

375. Darling found that the only enforced collection action that took place on the account was the filing of the liens. (Pl.Ex. 75). Finding that the filing of the liens was proper, Darling held that there was no error in the filing of the liens nor was there any violation of IRS legal or procedural requirements. (*Id.*)

376. This Court has already determined in this decision that the IRS did not violate statutory procedures when it filed either the 1999–2002 lien or the 2003–2004 lien. *See supra* Sections III, IV. This Court affirms this particular finding of Appeals Officer Darling.

### E. *Collection Alternatives*

377. During the May 10, 2005 meeting with Sobrevilla, Plaintiff discussed whether providing a bond or a letter of credit might prevent the filing of a lien. (Barrera, Day 1); (Hargis, Day 1); (Johnson, Day 1). Barrera testified that Plaintiff offered a bond or pledge around $200,000. (Barrera, Day 1); (Johnson, Day 1).

378. Sobrevilla could not agree to a bond at the time of the meeting. (Barrera, Day 1); (*see* Hargis, Day 1); (Johnson, Day 1). The acceptance of any bond or pledge was left to decision of Sobrevilla's manager. (Barrera, Day 1).

379. Johnson testified that if the IRS would have requested a $200,000 bond, he would have put up that bond. (Johnson, Day 1). Plaintiff, however, never put up a bond or line of credit. (Barrera, Day 1); (Johnson, Day 2).

380. IRS Appeals Officer Darling requested financial information from Plaintiff as part of Darling's determination of whether collection alternatives would be appropriate. (Pl.Ex. 75). Plaintiff did not provide any financial information in response to this request. (*Id.*)

381. When Plaintiff's counsel met with Darling as a part of the CDP appeal, Darling again addressed the issue of collection alternatives. (Pl.Ex. 75). Plaintiff's counsel stated that Plaintiff would not provide financial data because it was willing to pay the remaining balance once the amount was due. (*Id.*) Darling determined that Plaintiff was unwilling to agree to a balance due because Plaintiff believed there was no remaining liability. (*Id.*)

382. Plaintiff provided Darling with no financial data to use in making a determination of whether collection alternatives would be feasible. (Pl.Ex. 75).

383. While Plaintiff had discussed the possibility of posting a bond for the 2003–2004 periods in May 2005, Plaintiff's failure to provide the requested financial information during its CDP appeal and the position taken by Plaintiff during the face-to-face meeting with Darling, foreclosed

the possibility of offering Plaintiff any collection alternative.

### F. *Balancing Test*

384. The Appeals Officer must also consider "whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the person that any collection action be no more intrusive than necessary." Treas. Reg. § 301.6320–1(e), Q & A (E1) (as amended in 1999).

385. In light of the new considerations for the Appeals Office on remand of Plaintiff's CDP determination, this Court further **REMANDS** consideration of collection alternatives and the balancing test pursuant to Treas. Reg. § 301.6320–1(e), Q & A (E1) (as amended in 1999).

### G. *Conclusion*

386. Based on the multiple grounds for remand set forth above, this Court **REMANDS** Plaintiff's CDP appeal for 2003–2004 for a new CDP determination pursuant to the requirements of 26 U.S.C. § 6320 and its accompanying regulations.[11]

### VIII. CONCLUSIONS OF LAW

387. Defendant properly filed the 1999–2002 lien against Plaintiff after the Defendant fulfilled the requirements of 26 U.S.C. § 6321 by making assessments and sending notice to Plaintiff of taxes, interest, and penalties owed for periods in 1999–2002 and Plaintiff refused to pay outstanding tax liabilities for those periods. Since the 1999–2002 lien was properly filed, the lien was not unenforceable for

---

11. As part of a new CDP determination, 26 U.S.C. § 6320 and its accompanying regulations require a consideration of collection alternatives for the periods in 2003–2004. While this Court affirmed the CDP determination for 1999–2002, this Court believes that, given the past discussions of posting bonds in this case, it would not be inappropriate future consideration of collection alternatives to consider a bond to cover both the periods 1999–2002 and 2003–2004.

purposes of requiring a release of the lien pursuant to 26 U.S.C. §§ 6325 and 7432.

388. Since penalties assessed against Plaintiff for periods in 1999–2002 were incurred as a result of the errors of Plaintiff and its employees, Plaintiff did not establish reasonable cause for the abatement of penalties in 1999–2002.

389. Plaintiff has failed to fully pay all outstanding liabilities on the 1999–2002 lien. This Court, by this order, holds that Plaintiff is not entitled to abatement of penalties. Therefore, the liabilities on the 1999–2002 lien have not been satisfied for purposes of requiring the release of the lien pursuant to 26 U.S.C. §§ 6325 and 7432.

390. Plaintiff did not post a bond to the IRS to cover the liabilities on the 1999–2002 lien and did not satisfy the "furnishing a bond" provision of 26 U.S.C. § 6325 for purposes of requiring the release of the 1999–2002 lien under 26 U.S.C. § 7432.

391. Plaintiff failed to prove that the 1999–2002 lien was: (i) unenforceable; (ii) fully satisfied; or (iii) covered by a bond posted by the Plaintiff. Thus, the Plaintiff failed to satisfy the requirements of its claim under 26 U.S.C. § 7432 for release of the 1999–2002 lien.

392. The payment and adjustments agreed to on May 10, 2005 fully satisfied the then existing liabilities on the 2003–2004 lien as required by 26 U.S.C. §§ 6325 and 7432.

393. This Court need only find that *any* officer or employee of the IRS was negligent in failing to release a lien, and not that a particular employee was negligent, to support a claim under 26 U.S.C. § 7432. Either: (i) Sobrevilla was negligent in failing to submit the 2003–2004 lien to the district director for determination; (ii) the IRS clerical staff was negligent in failing to complete the adjustments agreed to on May 10, 2005; or (iii) the IRS district

director was negligent in failing to made a determination by July 24, 2005 at the latest that the 2003–2004 lien should have been released, or a combination of all three, as required by Treas. Reg. § 401.6325–1(c)(1) (1982). Regardless, some officer or employee of the IRS was negligent in failing to release the 2003–2004 lien.

394. Plaintiff's proof of the satisfaction of the liabilities on the 2003–2004 lien, coupled with the negligence of the IRS, fulfills the requirements of Plaintiff's 26 U.S.C. § 7432 claim against Defendant for the failure of the IRS to release the 2003–2004 lien.

395. By failing to provide evidence showing why the failure of the IRS to release 2003–2004 lien, by itself, caused Plaintiff's damages, Plaintiff did not satisfy the statutory requirement of 26 U.S.C. § 7432 that the failure to release the 2003–2004 lien was "but for" cause of Plaintiff's damages.

396. Plaintiff's failure to send an administrative claim to the IRS officer designated in Treas. Reg. § 301.7433–1 and to send the required documentation to substantiate the amount of damages stated in the claim amounts to a failure to exhaust administrative remedies denying this Court of jurisdiction over Plaintiff's 26 U.S.C. § 7433 claim.

397. In its CDP determination, the IRS did not properly consider: the outstanding tax liability for periods in 2003–2004 and certain arguments raised by the Plaintiff. Specifically, the CDP determination did not consider: (i) the standard set out by the IRS for the abatement of penalties in the context of the 2003–2004 EFTPS–Through a Financial Institution transactions where the Bank admitted its failure to properly train Plaintiff's employees caused Plaintiff's late payments; and

(ii) the payment and adjustments agreed to on May 10, 2005.

## IX. CONCLUSION

398. Defendant is **ORDERED** to release all liens against Plaintiff covering the periods in 2003–2004 and any subsequent liens associated with the 2003–2004 tax periods. However, Plaintiff is not entitled to any damages regarding the failure to release such liens.

399. Plaintiff's CDP determination from February 28, 2006 is **REMANDED** for a new CDP determination pursuant 26 U.S.C. § 6320, its accompanying regulations and the considerations set out by this decision.

400. Plaintiff failed to carry its burden of proof on all its remaining claims. Those claims are hereby **DENIED.**

401. All other relief not expressly granted herein is **DENIED.**

402. Plaintiff has thirty (30) days from the entry of this order to submit an application for fees and costs in accordance with 26 U.S.C. § 7430 and 28 U.S.C. § 2412. This Court **ORDERS** that any application for fees by the Plaintiff be accompanied by a brief explaining the factual and legal basis for Plaintiff's application for fees. Plaintiff is also advised to segregate fees on the issues on which it prevailed from those fees expended on other issues. Defendant will have twenty (20) days, pursuant to local rules, to respond to Plaintiff's application for fees. Plaintiff is reminded that this brief must discuss the implications of Plaintiff's success on only its claim under 26 U.S.C. § 7432 claim for failure to release the 2003–2004 lien and for the remand of certain aspects of Plaintiff's 2003–2004 CDP determination, as well as this Court's holding that Plaintiff is not entitled to damages on its successful Section 7432 claim.

403. While this Court has made certain findings contrary to the positions advocated by both Plaintiff and Defendant, the Court finds that the Plaintiff, while failing to timely pay its taxes, did so without any intent to defraud the United States and that its actions were done without any malicious intent. Similarly, the Court finds that Mr. Sobrevilla, the principal figure for the Defendant in this situation, while having misled the Plaintiff (albeit unintentionally), acted neither with harmful intent nor malice toward the taxpayer.

404. The preceding paragraphs are to be considered findings of fact and, where appropriate, conclusions of law regardless of any heading or label. While not the usual format for findings and conclusions, the Court found this format to be the most logical way to address the issues.

405. This Court will not enter final judgment in this case at this time. Final judgment will be entered after this Court receives parties' briefs and arguments on the issue of attorneys' fees and costs and this Court issues a ruling on said fees and costs.